J-A30020-18

2019 PA Super 186

| | | |
|---|---|---|
| RENEE' A. RICE | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DIOCESE OF ALTOONA- | : | No. 97 WDA 2018 |
| JOHNSTOWN, BISHOP JOSEPH | : | |
| ADAMEC (RETIRED), MONSIGNOR | : | |
| MICHAEL E. SERVINSKY, EXECUTOR | : | |
| OF THE ESTATE OF BISHOP JAMES | : | |
| HOGAN, DECEASED, AND REVEREND | : | |
| CHARLES F. BODZIAK | : | |

Appeal from the Order Entered, December 15, 2017,
in the Court of Common Pleas of Blair County,
Civil Division at No(s):  2016 GB 1919.

BEFORE:   SHOGAN, J., KUNSELMAN, J., and STRASSBURGER*, J.

OPINION BY KUNSELMAN, J.:                         FILED JUNE 11, 2019

In 2016, Renee' A. Rice read the 37th Investigative Grand Jury Report
detailing a systematic cover-up of pedophile clergy in the Diocese of Altoona-
Johnstown.  She sued the Diocese, Bishop Adamec, and Monsignor Michael E.
Servinsky[1] ("the Diocesan Defendants") a few months later.  She alleges that
they committed fraud, constructive fraud, and civil conspiracy to protect their
reputations and that of Reverend Charles F. Bodziak, her childhood priest and
alleged abuser.

_____

[1] Ms. Rice sued Monsignor Servinsky as the Executor of the Estate of Bishop
James J. Hogan.  She also sued Reverend Charles F. Bodziak, but Ms. Rice has
not appealed the trial court's grant of judgment on the pleadings as to Fr.
Bodziak.

_____

*   Retired Senior Judge assigned to the Superior Court.

Because Fr. Bodziak allegedly molested Ms. Rice in the 1970s and 1980s, the trial court, relying on this Court's precedents and the statute of limitations, dismissed her lawsuit. Claiming the trial court misapplied the discovery rule, the fraudulent-concealment doctrine, and the statute of limitations for civil conspiracy, Ms. Rice appealed.

Ten months later, the Supreme Court of Pennsylvania decided Nicolaou v. Martin, 195 A.3d 880 (Pa. 2018). The High Court emphasized the jury's prerogative, under the discovery rule, to decide whether a plaintiff's efforts to investigate a defendant were sufficiently reasonable to toll the statute of limitations. Nicolaou has opened the courthouse doors for Ms. Rice's case to proceed past the pleadings stage, notwithstanding this Court's precedents to the contrary.

Also, Ms. Rice's alleged circumstances allow her to argue to the finder of fact that the Diocesan Defendants owed her a fiduciary duty to disclose their ongoing cover-up and Fr. Bodziak's history of child molestation. By failing to disclose, the Diocesan Defendants' silence may have induced Ms. Rice to relax her vigilance or to deviate from her right of inquiry. The trial court, therefore, erred by not permitting her case to proceed according to her fraudulent-concealment theory.

Finally, even if a jury rejects those two tolling theories, Ms. Rice's civil conspiracy count remains viable. She alleges a continuing conspiracy and that the last act in furtherance of the conspiracy occurred in 2016. Based upon

these allegations, Ms. Rice has filed this lawsuit well within the statute of limitations for civil conspiracy.

Accordingly, we reverse the order granting judgment on the pleadings to the Diocesan Defendants and remand for the case to proceed in the trial court.

## I. Facts Alleged in the Complaint

Ms. Rice alleges in her First Amended Complaint[2] that, as a child and teenager, she belonged to St. Leo's Church in Altoona. She attended the Catholic school associated with her parish, when the Diocesan Defendants assigned Fr. Bodziak to serve as St. Leo's pastor. They did this, despite knowing or having reason to know he had molested young girls. Fr. Bodziak began sexually abusing Ms. Rice in the mid-1970s. She was about nine-years-old, and he continued abusing her until she turned 14.

During that time, Fr. Bodziak asked Ms. Rice's parents if she could clean the rectory where he lived. They agreed. While she cleaned his home, Fr. Bodziak would give Ms. Rice wine and sexually assault her.

Ms. Rice also played the organ at St. Leo's Church and sang at masses. Fr. Bodziak – under the auspices of allowing Ms. Rice to rehearse her musical skills – gave her a key to the church. However, while she practiced in the choir loft, Fr. Bodziak would come into the church to kiss and molest her. Over

---

[2] Pursuant to our scope and standard of review, which we discuss in greater detail below, we must accept the facts alleged in Ms. Rice's complaint as true when reviewing the dismissal of her case at the pleadings stage. See, e.g., Rubin v. CBS Broadcasting, Inc., 170 A.3d 560, 564 (Pa. Super. 2017).

time, the abuse increased in frequency to twice a week in the priest's car, a nearby cemetery, the rectory, and the church.

Some 35 years later, the Attorney General of Pennsylvania convened the 37th Statewide Investigative Grand Jury to examine child-sexual assault throughout the Altoona-Johnstown Diocese. It issued an official report of its findings on March 1, 2016.

From that report, Ms. Rice first learned that the Diocesan Defendants knew or should have known of Fr. Bodziak's pedophilia prior to assigning him to St. Leo's Church. The Diocesan Defendants kept the evidence about abusive priests in a secret archive, separate from other personnel files.

Ms. Rice asserted a confidential relationship between herself and the Diocesan Defendants, based upon her work as a parish organist, cantor, and rectory cleaner, coupled with her young age, Catholic schooling, and the trust she placed in the Diocesan Defendants to guide and to protect her. The Diocesan Defendants purportedly violated their corresponding fiduciary duty to warn her about Fr. Bodziak's past as a child predator. They thereby placed their own reputation and finances ahead of her safety and mental health.

As mentioned, Ms. Rice has asserted three claims – fraud, constructive fraud, and civil conspiracy. She also alleged new harms and exacerbation of old injuries upon reading the Grand Jury Report in 2016.

The Diocesan Defendants filed an answer and new matter, raising the statute of limitations as their primary defense. They argued, because the molestation last occurred in 1981, Ms. Rice's causes of action expired on

- 4 -

October 23, 1987 – i.e., two years after her 18th birthday. To support that contention, they predominately relied upon two cases from this Court that had affirmed judgments on the pleadings in favor of pedophile clergy and various, corporate manifestations of the Catholic Church under the statute of limitations. See Meehan v. Archdiocese of Philadelphia, 870 A.2d 912 (Pa. Super. 2005), and Baselice v. Franciscan Friars Assumption BVM Province, Inc., 879 A.2d 270 (Pa. Super. 2005) (both holding that the statute of limitations time-barred cases, because the victims should have known that the Church was potentially liable for any harm they suffered the moment a clergy member sexually assaulted them).

The trial court observed "that the law is trending toward allowing the discovery rule and the doctrine of fraudulent concealment to toll the statute of limitations in . . . cases such as this." Trial Court Opinion, 12/15/17, at 10 (footnote omitted). However, it found itself "constrained to rule in accordance with the controlling law in Pennsylvania" and granted judgment on the pleadings to the Diocesan Defendants on all three of Ms. Rice's claims. Id.

Ms. Rice timely appealed that decision. Instead of ordering Ms. Rice to file a 1925(b) statement, the trial court relied on its opinion granting judgment on the pleadings to the Diocesan Defendants to serve as its 1925(a) opinion.

## II.    Analysis

When reviewing a grant of judgment on the pleadings, our scope of review is plenary, and our standard of review is de novo. Altoona Regional Health System v. Schutt, 100 A.3d 260, 265 (Pa. Super. 2014). Moreover,

"every material and relevant fact well-pleaded and every inference fairly deducible therefrom are to be taken as true." Baker v. Rangos, 324 A.2d 498, 508 (Pa. Super. 1974).

We may affirm a judgment on the pleadings only if:

> there are no disputed issues of fact, and the moving party is entitled to judgment as a matter of law. In determining if there is a dispute as to facts, the court must confine its consideration to the pleadings and relevant documents. On appeal, we accept as true all well-pleaded allegations in the complaint . . . . Only when the moving party's case is clear and free from doubt such that a trial would prove fruitless will an appellate court affirm a motion for judgment on the pleadings.

Rubin v. CBS Broadcasting, Inc., 170 A.3d 560, 564 (Pa. Super. 2017).

No one disputes that Ms. Rice made well-pleaded allegations; we thus accept them as true at this point in the litigation. In light of our standards and Ms. Rice's complaint, we turn to her three appellate issues. They are:

1.  Did Ms. Rice plead sufficient facts giving rise to a jury question under the discovery-rule?

2.  Did Ms. Rice plead sufficient facts to estop the Diocesan Defendants from asserting a statute-of-limitations defense under the doctrine of fraudulent concealment?

3.  Does the statute of limitations for Ms. Rice's conspiracy claim begin to run only after the last act in furtherance of that conspiracy?

Rice's Brief at 3 (paraphrased for sake of clarity).

Ms. Rice's first two issues seek to toll the statute of limitations. In the event neither tolling theory prevails, her third issue challenges the dismissal

- 6 -

of her civil-conspiracy claim as a misapplication of the statute of limitations. We address all three issues in turn.

A.     Ms. Rice Alleged Sufficient Facts to Support Her Discovery-Rule Theory.

Ms. Rice's first appellate issue asserts the trial court misapplied the discovery rule and, therefore, erroneously dismissed her case, as a matter of law.

According to Ms. Rice, whether she exercised reasonable diligence in investigating the Diocesan Defendants' intentional torts is a factual question for a jury. She argues a reasonable person would not have suspected or investigated the Diocesan Defendants for those torts before the Grand Jury Report was unsealed in 2016. While conceding that Fr. Bodziak sexually abused her in the 1970s and 1980s, she claims "the Grand Jury Report gave her reason to investigate, for the first time, that the conspiracy and fraud committed by the Diocesan Defendants was the cause of her harm." Ms. Rice's Brief at 20, n. 2.

The Diocesan Defendants counter that this Court's precedents bar Ms. Rice's claims. They argue the trial court properly dismissed her suit under a two-year statute of limitations because Ms. Rice is "seeking damages as a result of the underlying harm" – i.e., the molestation. Diocesan Defendants' Brief at 7. They believe Ms. Rice should have known they were a potential cause of her harm the moment Fr. Bodziak sexually assaulted her.

We begin with the statute of limitations. Ms. Rice has alleged fraud, constructive fraud, and civil conspiracy. The statute of limitations for a cause "action or proceeding to recover damages for injury to person . . . which is founded on . . . deceit or fraud" is two years. 42 Pa.C.S.A. § 5524(7). Also, it "is well-settled that the statute of limitations for conspiracy is the same as that for the underlying action which forms the basis of the conspiracy." Kingston Coal Co. v. Felton Min. Co., Inc., 690 A.2d 284, 287 (Pa. Super. 1997) (citing Ammlung v. City of Chester, 494 F.2d 811, 814-815 (3d. Cir. 1974). Here, Ms. Rice has based her underlying cause action in fraud; thus, her civil-conspiracy claim has a two-year filing period.

"The time within which a matter must be commenced under this chapter shall be computed . . . from the time the cause of action accrued." 42 Pa.C.S.A. § 5502(a).[3] "In Pennsylvania, a cause of action accrues when the plaintiff could have first maintained the action to a successful conclusion." Fine v. Checcio, 870 A.2d 850, 857 (Pa. 2005). For personal-injury torts, a cause of action "arises when the injury is inflicted." Id. However, the discovery rule, when applicable, delays the running of the statutory period until such time as the plaintiff knows or should have known (1) of the injury and (2) that the defendant's conduct was the cause of that injury. Id.

---

[3] For most tort victims under the age of 18, the statute of limitations does not begin to run until their 18th birthdays. See 42 Pa.C.S.A. § 5533(b)(1). Though not applicable to Ms. Rice, we note that the legislature recently extended the statute of limitations in child-sexual-assault cases to expire on the victim's 30th birthday, if nothing else tolls it. See 42 Pa.C.S.A. § 5533.

The discovery rule arises from "the inability of the injured [person], despite the exercise of reasonable diligence, to know that [she] is injured and by what cause . . . ." Id. at 858. Under Pennsylvania law, a jury typically decides whether a plaintiff has exercised reasonable diligence in investigating who caused her harm. Id. A plaintiff must convince the jurors she exercised reasonable diligence in investigating a cause of action and, despite that diligence, could not have reasonably discovered either (1) that she suffered an injury or (2) that the defendant's conduct caused her injury.

The Fine Court described reasonable diligence as:

> what is expected from a party who has been given reason to inform himself of the facts upon which his right to recovery is premised . . . there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful . . . . [T]he question in any given case is . . . what might he have known, by the use of the means of information within his reach, with the vigilance the law requires of him? While reasonable diligence is an objective test, it is sufficiently flexible . . . to take into account the differences between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question . . . . [O]rdinarily, a jury is to decide [this question]. Where, however, reasonable minds would not differ in finding that a party knew or should have known on the exercise of reasonable diligence of his injury and its cause, the court determines that the discovery rule does not apply as a matter of law.

Fine, 870 A.2d at 858-859 (citations and some punctuation omitted).

Under Fine, Ms. Rice contends a jury must decide the factual question of whether she demonstrated reasonable diligence in attempting to discover if the Diocesan Defendants' intentional torts harmed her.

- 9 -

The Diocesan Defendants claim the trial court properly disposed of Ms. Rice's claims. They rely on this Court's holdings in Meehan, supra; its companion case, Baselice, supra; and their progeny.[4]

We agree that the facts of Meehan and Baselice are similar to those in Ms. Rice's complaint. However, the recent analysis of the Supreme Court of Pennsylvania in Nicolaou v. Martin, 195 A.3d 880 (Pa. 2018), abrogated Meehan, Baselice, and this Court's decisions applying them, sub silentio.[5]

_____

[4] The progeny of Meehan v. Archdiocese of Philadelphia, 870 A.2d 912 (Pa. Super. 2005), and Baselice v. Franciscan Friars Assumption BVM Province, Inc., 879 A.2d 270 (Pa. Super. 2005) include Aquilino v. Philadelphia Catholic Archdiocese, 884 A.2d 1269 (Pa. Super. 2005); Vojtasek v. Diocese of Allentown, 916 A.2d 637 (Pa. Super. 2006); Lazarski v. Archdiocese of Philadelphia, 926 A.2d 459 (Pa. Super. 2007); and Delaney v. Archdiocese of Philadelphia, 924 A.2d 659 (Pa. Super. 2007). The Diocesan Defendants recite these cases in a litany. See Diocesan Defendants' Brief at 15-23. That said, the progeny contribute little to their overall theory of the case, because those subsequent decisions simply applied Meehan and Baselice without expounding upon the underlying rationales.

[5] Having filed their brief five months before our Supreme Court's Nicolaou decision, the Diocesan Defendants greatly rely upon this Court's now-overturned en banc opinion. See Diocesan Defendants' Brief at 44-47 (citing Nicolaou v. Martin, 153 A.3d 383 (Pa. Super. 2016) (en banc)). They argue "the record was replete with evidence that the plaintiff in Nicolaou always suspected she had Lyme disease despite what her healthcare providers advised her." Id. "The Superior Court in Nicolaou determined that, without question, the plaintiff knew as early as July 20, 2009, when a nurse practitioner informed her that she believed that Ms. Nicolaou had Lyme disease, that Ms. Nicolaou had an obligation at that point in time to initiate her cause of action." Id. at 46. The Supreme Court ultimately deemed our analysis to be erroneous.

In Nicolaou, the plaintiffs waited over a decade to sue Mrs. Nicolaou's healthcare providers for failing to diagnose her Lyme disease. Suspecting she had Lyme disease, Mrs. Nicolaou eventually saw a nurse practitioner ("N.P.") who specialized in that illness. The N.P. said she probably had Lyme disease and began to treat her successfully for it. Even so, Mr. and Mrs. Nicolaou waited three more years to sue Mrs. Nicolaou's prior doctors. The trial court, applying the statute of limitations and barring the Nicolaous' discovery-rule theory, granted the doctors summary judgment. This Court, en banc, agreed with the trial court and affirmed.

A unanimous Supreme Court reversed, because the trial court and this Court had invaded the province of the jury.[6] In applying the discovery rule, the Supreme Court held "Pennsylvania's well-established general rule should apply — i.e., that the factual issues pertaining to Plaintiffs' notice and diligence are for a jury to decide." Nicolaou, 195 A.3d at 894 (emphasis added).

> [T]he Superior Court erred by concluding, as a matter of law, that Plaintiffs knew or should have known sometime between July and September of 2009 (the dates of the first few visits with [N.P.] Rhoads) that Mrs. Nicolaou suffered from Lyme disease and that her debilitating health problems could have been caused by Defendants' failure to diagnose and treat such condition. The Superior Court relied upon the fact that by such time an MRI had indicated that Mrs. Nicolaou had suffered from either Lyme disease or MS, [N.P.] Rhoads had informed Mrs. Nicolaou of a probable diagnosis of Lyme disease based upon her clinical

_____

[6] Justice Wecht recused, because he had participated in Nicolaou while a judge on this Court.

symptoms, and some of Mrs. Nicolaou's symptoms had improved upon administration of antibiotics. When viewed in a vacuum, these facts may have alerted a reasonable person that she suffered an injury at the hands of medical professionals who failed to diagnose and treat her Lyme disease. Indeed, these circumstances may or may not persuade a jury to so conclude.

However, courts may not view facts in a vacuum when determining whether a plaintiff has exercised the requisite diligence as a matter of law, but must consider what a reasonable person would have known had he or she been confronted with the same circumstances that Mrs. Nicolaou faced at the time. When viewing the evidence in this manner, it is simply uncertain whether Plaintiffs knew or should have known that Defendants' misdiagnosis caused Mrs. Nicolaou's injuries at the precise moment that [N.P.] Rhoads suggested the same . . .

Until the conflicts in the record are resolved and inferences from the facts are drawn, the issue of whether Plaintiffs knew or should have known of the injury and that it was caused by Defendants' negligent conduct remains disputed. To find the discovery rule inapplicable, the Superior Court was required to undertake fact-resolution and inference-drawing functions, which are preserved for the jury. See Fine, [870 A.2d] at 862 (holding that "it is not the court's function upon summary judgment to decide issues of fact, but only to decide whether there is an issue of fact to be tried").

Nicolaou, 195 A.3d at 894–895 (emphasis added).

Pursuant to Nicolaou, we may no longer "view facts in a vacuum when determining whether a plaintiff has exercised the requisite diligence as a matter of law" to preclude a plaintiff's invocation of the discovery rule. Id. at 894. As we will demonstrate, Meehan, Baselice, and their progeny reviewed child-sexual-abuse allegations in the vacuum that Nicolaou now forbids.

Meehan and Baselice, decided only a few months apart, had similar facts. Both cases had the same holdings on the discovery rule and fraudulent concealment. We discuss them interchangeably throughout this Opinion.

In Meehan, the trial court consolidated several child-sexual-abuse cases against the Catholic Church. The case involved a group of plaintiffs and an individual plaintiff. The group of plaintiffs, claiming various priests and a nun molested them, only sued the Archdiocese of Philadelphia and Cardinal Bevilacqua. The group brought claims of negligence, negligence per se, failure to warn, negligent supervision, and failure to provide a secure environment.

The individual plaintiff sued the Archdiocese of Philadelphia and Cardinal Bevilacqua, the Estate of Cardinal Krol, St. Monica Roman Catholic Church, and his alleged abuser, Fr. Gallagher. He alleged battery, intentional infliction of emotional distress, negligent infliction of emotional distress, fraudulent concealment, negligence, negligence per se, and respondeat superior. All of the plaintiffs filed suit in 2004, even though the alleged molestations occurred between 1957 and 1983.

In Baselice, the plaintiff sued the Franciscan Friars Assumption BVM Province, Inc.; Fr. Thomas Luczak; the Archdiocese of Philadelphia; Archbishop Ryan High School; Cardinal Rigali; and Cardinal Bevilacqua. The plaintiff asserted many causes of action, including civil conspiracy, and alleged a priest at Archbishop Ryan High School abused him between 1992 and 1996. He did not file suit until June of 2004.

The Meehan plaintiffs argued that they could not have discovered the defendants' "pattern of conduct until 2002, when the Archdiocese of Philadelphia acknowledged allegations of sexual abuse . . . ." Meehan, 870 A.2d at 918. Thus, they asserted that the discovery rule and fraudulent-concealment doctrine tolled the statute of limitations. The Meehan Court held that none of the plaintiffs could assert the discovery rule, as a matter of law. Meehan's holding relied upon three facts: (1) the plaintiffs knew they were injured, (2) they knew the identity of the primary cause of their injury and that their abusers were employees of the archdiocese, and (3) they knew the abuses took place on church property. "These facts alone were sufficient to put the plaintiffs on notice that there was a possibility that the archdiocese had been negligent." Meehan at 921 (emphasis added).

Hence, the Meehan Court credited and considered only certain facts in the complaint. Specifically, it credited the facts favorable to the archdiocese and its hierarchy. The panel then inferred from those facts that no reasonable person in the plaintiffs' circumstances should have failed to investigate the defendants. It thereby discounted all of the facts and inferences favorable to the plaintiffs' discovery-rule theory, and the Meehan Court undertook "fact-resolution and inference-drawing functions, which are preserved for the jury." Nicolaou, 195 A.3d at 895. Baselice did likewise.

We thus conclude that Meehan, Baselice, and their progeny improperly discounted all pro-plaintiff facts and undertook the fact-finding and inference-drawing functions this Court erroneously undertook in Nicolaou. Thus, we

- 14 -

cannot reconcile the "these-facts-alone" approach of Meehan and Baselice with Nicolaou's prohibition against viewing alleged facts in a vacuum.

When, as here, precedent of the Supreme Court of Pennsylvania and this Court conflict, the Supreme Court's controls. See, e.g., Commonwealth v. King, 430 A.2d 990, 991 (Pa. Super. 1981) (holding that a Supreme Court case overrules contrary precedents of this Court "sub silentio."). Accordingly, Nicolaou constructively overruled Meehan, Baselice, and all their progeny for discovery-rule purposes.

We now apply Nicolaou to Ms. Rice's discovery-rule theory and alleged facts.

The Diocesan Defendants argue that Ms. Rice "was aware of the primary cause of her injury (the conduct of Father Bodziak)." Diocesan Defendant's Brief at 27. Also, they claim that she knew they employed Fr. Bodziak and that the abuse occurred on church property. The Diocesan Defendants believe that these facts alone were sufficient to put Ms. Rice on notice, and that her ignorance of the Diocesan Defendant's cannot toll the statute of limitations.

When the Diocesan Defendants make this argument to a jury, perhaps jurors will agree that Ms. Rice had notice of the frauds and conspiracy that facilitated, hid, and protected child predators like Fr. Bodziak. "When viewed in a vacuum, these facts may have alerted a reasonable person that she suffered an injury at the hands of" the Diocesan Defendants for fraud, constructive fraud, and civil conspiracy. Nicolaou at 894. "Indeed, these circumstances may or may not persuade a jury to so conclude." Id.

Ms. Rice, on the other hand, avers that no reasonable person would have suspected, much less investigated, the Diocesan Defendants for the torts she has alleged until the Grand Jury Report became public. She asserts no inquiry by her could have obtained the information revealed in the Grand Jury Report because the Diocesan Defendants suppressed it within their "secret archive." First Amended Complaint at 10. In other words, there was no "reason to awaken inquiry and direct diligence in the channel in which it would be successful." Fine, 870 A.2d at 858.

As Ms. Rice points out, prior to the Grand Jury Report, no police force, district attorney's office, or governmental agency investigated the Diocesan Defendants for this diocese-wide, child-sexual-abuse scandal. None of the Commonwealth's prosecutors, investigators, or child-protection departments discovered the Diocesan Defendants' alleged conduct for over 50 years. Thus, we cannot fairly conclude that Ms. Rice's similar failure to discover their alleged conduct was unreasonable, as a matter of law.

"Until the conflicts in the record are resolved and inferences from the facts are drawn, the issue of whether" Ms. Rice knew or should have known through reasonable, investigative efforts that her injuries were "caused by Defendants' [intentional] conduct remains disputed." Nicolaou at 895. To find the discovery rule inapplicable here, we would need to engage in the fact-finding and inference-drawing functions that Nicolaou teaches "are preserved for the jury." Id.

Whether Ms. Rice exercised reasonable diligence, prior to the release of the Grand Jury Report, is a factual question over which reasonable minds might differ. Under Nicolaou, Ms. Rice's discovery-rule theory may proceed.

B. Ms. Rice's Alleged Fraudulent Concealment, if Proven, Estops the Diocesan Defendants from Raising the Statute of Limitations.

Like the discovery rule, the doctrine of fraudulent concealment may toll a statute of limitations. Fine, 870 A.2d at 858. Ms. Rice asserts in her second appellate issue that the trial court improperly enforced the statute of limitations, because the doctrine of fraudulent concealment applies and bars the Diocesan Defendants from asserting their statute-of-limitations defense. "The doctrine is based on a theory of estoppel, and provides that the defendant may not invoke the statute of limitations, if through fraud or concealment, he causes the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts." Id. at 860.

In rejecting Ms. Rice's fraudulent-concealment theory, the trial court opined:

> [T]he Meehan court determined that the doctrine would not apply to toll the statute of limitations where the defendants never concealed from any of the plaintiffs the fact of the injury itself. [Meehan, 870 A.2d] at 922. Moreover, the defendants' general conduct and silence did not conceal from the plaintiffs an additional theory of liability for the alleged abuse. Id. The Meehan court summarized that "to postpone the accrual of causes of action until the plaintiffs completed their investigation of all potential liability theories would destroy the effectiveness of the limitations period." Id.

- 17 -

Trial Court Opinion, 12/15/17, at 9.

Ms. Rice argues the trial court improperly applied Meehan. She avers her relationship with the Diocesan Defendants was unlike the relationships the Meehan plaintiffs had with the Archdiocese of Philadelphia. Ms. Rice's Brief at 36. She asserts a special, confidential relationship with the Diocesan Defendants that created a fiduciary duty for the Diocesan Defendants to disclose (1) Fr. Bodziak's past to her, and (2) their intentional acts to protect his and their reputations at the expense of her wellbeing. First Amended Complaint at 10. Thus, Ms. Rice argues the silence of the Diocesan Defendants is a fraudulent concealment, because they had an obligation to inform her of their plans to shield their and the priest's reputations.

The Diocesan Defendants counter that Pennsylvania courts have never held that a special relationship exists between a parishioner and her diocese. Thus, they maintain they had no duty to disclose anything to her. They also suggest that Ms. Rice's allegations are of "systemic misconduct with regard to other priests, other parishioners, and the general public." Diocesan Defendants' Brief at 29-30 (quoting Baselice, 879 A.2d 278). They argue the fraudulent-concealment doctrine does not apply to her.[7]

_____

[7] We also note that the Diocesan Defendants suggest Ms. Rice waived this issue, because she did not allege in the amended complaint that the Diocese and Fr. Bodziak owed her a fiduciary duty. Diocesan Defendants' Brief at 49. In Pennsylvania, "the terms 'fiduciary relationship' and 'confidential relationship' may be used interchangeably." Yenchi v. Ameriprise Fin., Inc., 161 A.3d 811, 817 n. 5 (Pa. 2017). They are synonymous. As such,

We agree with Ms. Rice. The trial court overextended Meehan.

First, we explain fraudulent concealment and demonstrate that our precedents allow for the personalized, confidential-relationship theory that Ms. Rice asserts. After reviewing case law from other jurisdictions, we conclude the cases permitting parishioners with specialized circumstances to assert confidential relationships with their priest or church reflect Pennsylvania law. Second, we hold that, if Ms. Rice proves a confidential relationship between herself and the Diocesan Defendants, the Diocesan Defendants had a duty to disclose their cover-up to her in the 1970s. If a jury finds that they breached that duty to disclose, it may also infer that Ms. Rice reasonably interpreted their silence to mean they had nothing worthy of disclosure. Thus, she may have reasonably relaxed her vigilance or reasonably deviated from her right of inquiry. While the ultimate success or failure of her theory will turn on the factual findings of a jury, Ms. Rice has pleaded allegations that, if proven, estop the Diocesan Defendants from asserting the statute of limitations.

We begin with the doctrine of fraudulent concealment. The Fine Court held that "fraudulent concealment" does not mean "fraud in the strictest sense encompassing an intent to deceive, but rather, fraud in the broadest sense,

_____

the Diocesan Defendants' contention that Ms. Rice waived her fiduciary-relationship claim by pleading a confidential one lacks merit.

They also argue Ms. Rice did not allege an in loco parentis relationship in her amended complaint. Ms. Rice specifically alleged that Fr. Bodziak acted in loco parentis. First Amended Complaint at 4. Thus, this argument likewise fails.

which includes an unintentional deception." Fine, 870 A.2d at 860. Thus, any deceptive act, regardless of a defendant's mental state, will do. Whether estoppel results from the facts is a legal question for the court, but the jury must resolve any dispute as to what those facts may be. Id.

Fraudulent concealment will not toll the statute of limitations forever, because the Fine Court also held:

> [T]he standard of reasonable diligence, which is applied to the running of the statute of limitations when tolled under the discovery rule, also should apply when tolling takes place under the doctrine of fraudulent concealment . . . . Thus, we conclude that a statute of limitations that is tolled by virtue of fraudulent concealment begins to run when the injured party knows or reasonably should know of his injury and its cause.

Id. at 861.

A defendant must have committed an affirmative, independent act of concealment upon which the plaintiff justifiably relied for the doctrine of fraudulent concealment to apply. See Kingston Coal Co. v. Felton Mining Co. Inc., 690 A.2d 284, 291 (Pa. Super. 1997). Also, "mere silence in the absence of a duty to speak cannot suffice to prove fraudulent concealment." Lange v. Burd, 800 A.2d 336 (Pa. Super. 2002) (emphasis added). Based upon that language, Ms. Rice argues the opposite is also true – namely, that silence, in the presence of a duty to speak, may be a fraudulent concealment.

This Court did not address the fiduciary-duty-to-disclose theory in either Meehan or Baselice, supra. In those cases, we held, as a matter of law, that none of the plaintiffs had pleaded facts giving rise to a confidential

relationship between themselves and the defendants. Their relationships were too general in nature and, if we had recognized them, we would have extended a confidential relationship to all parishioners.

In a footnote, the Meehan Court explained that the:

Plaintiffs have argued that their general relationship to the Archdiocese amounts to the specific level of an attorney-client, doctor-patient, or clergy-penitent relationship. While the general relationship between the Archdiocese and its church members may be considered, in some circumstances, overbearing, no specific, legally recognized higher level association, such as the aforementioned relationships, exists in the current matter.

Meehan, 870 A.2d at 922 n.9 (emphasis added); see also Baselice, 879 A.2d at 279 n.4 (accord, quoting Meehan). Accordingly, we conclude that neither Meehan nor Baselice considered the specialized relationship that Ms. Rice has alleged, but rather the "general relationship" of parishioners-at-large. Id.

Ms. Rice seeks to prove the Diocesan Defendants had a confidential relationship with her, individually. She therefore does not claim that such a relationship extends to all parishioners, generally. Meehan and Baselice are not on point, and the trial court's reliance upon them was misplaced.

When a party alleges a confidential relationship, a court must determine "whether it is clear that the parties did not deal on equal terms." Frowen v. Blank, 425 A.2d 412, 416 (Pa. 1981). A "confidential relationship exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind." Id. at 418 (quoting

THE RESTATEMENT (SECOND) OF TRUSTS, § 2(b)). These are fact-driven matter, generally for the finder of fact to decide, because the "concept of a confidential relationship cannot be reduced to a catalogue of specific circumstances, invariably falling to the left or right of a definitional line." In re Estate of Scott, 316 A.2d 883, 885 (Pa. 1974).

Applying Frowen, the United States District Court for the Middle District of Pennsylvania in Doe v. Liberatore, 478 F.Supp.2d 742 (M.D. Pa. 2007), denied summary judgment to the Diocese of Scranton where a plaintiff alleged a confidential relationship, similar to the one Ms. Rice alleges. That court held a jury might find the plaintiff was more than a mere parishioner. The court stated that a fiduciary relationship "is one wherein a party is bound to act for the benefit of another, and can take no advantage to himself." Id. at 766 (quoting Leedom v. Palmer, 117 A. 410, 411 (Pa. 1922)).

A confidential relationship could arise under Pennsylvania law, according to the Liberatore Court, in specialized circumstances. This includes a counseling relationship between a priest and parishioner, or between a diocese and a parishioner who is involved in church activities or functions, beyond merely attending church services. Such a confidential relationship forms:

> once the priest accepts the parishioner's trust and accepts the role of counselor. In such a case, the parishioner has justifiably placed his trust in the priest. In order to receive and make use of a priest's advice and counsel, a parishioner must necessarily depend upon the priest's knowledge and expertise, resulting in the priest's superiority and influence over the parishioner. Thus, once a counseling relationship has commenced, the parishioner and priest no longer deal on equal terms. This unequal relationship affords the priest

opportunity to abuse the trust and confidence reposed in him or prey on a weak and dependent parishioner to his own benefit. The relationship therefore becomes fiduciary in nature . . . .

As to a diocese, a diocese exerts an overmastering influence over a plaintiff, or a plaintiff exhibits weakness, dependence on, or justifiable trust in the diocese and its officials when, as here, the plaintiff is a minor and is involved in the church beyond that of a mere parishioner, whether by virtue of his serving the church, participating in church-sponsored activities, or receiving counseling from a priest. When the plaintiff is a minor, the power differential between the plaintiff and priest is magnified. This power differential makes it difficult for a minor who is involved in the church to refuse the unwelcome, sexual advances of a priest or report such an advance to his parents or the authorities. Minors participating in church activities are therefore dependent on the diocese for protection, and the diocese is responsible to provide it. This vulnerability requires the diocese to be vigilant, so that minors who are serving the church, participating in church activities, or receiving counseling from a diocesan priest are doing so in an environment free from the threat of sexual abuse.

Liberatore, 478 F.Supp.2d at 771-772 (citations omitted).

The court concluded that a certain parishioner could, under Meehan and Baselice, plead facts giving rise to a personalized, confidential relationship with a priest or the dioceses. In reaching that conclusion, the district court reviewed case law from around the nation. It found no court of last resort that recognizes a confidential relationship arising between a clergy member and a parishioner on those grounds alone.[8] However, many courts

_____

[8] The extensive research in Doe v. Liberatore, 478 F.Supp.2d 742 (M.D. Pa. 2007) revealed that the following courts declined to find a confidential relationship, where no special relationship was alleged: Gaines v.

have concluded such relationships could arise if "there is a special relationship between the plaintiff-parishioners and the defendant priest or diocese, such as when the plaintiff-parishioner received counseling from a diocesan priest or participated in church-sponsored activities."[9]  Id. at 768.  The district court

_____

Krawczyk, 354 F.Supp.2d 573 (W.D. Pa. 2004) (holding that, in the absence of a counseling relationship, or any special relationship, between the priest and minor student, there was no fiduciary relationship); Doe v. Hartz, 52 F.Supp.2d 1027, (N.D. Iowa 1999) (finding no fiduciary relationship, because plaintiff alleged only a priest-parishioner relationship, and not a counseling relationship).

Additionally, other courts would not address the issue based upon First Amendment concerns.  See Dausch v. Rykse, 52 F.3d 1425, 1438 (7th Cir.1994) (declining to decide whether a confidential relationship existed at all on First Amendment grounds); Teadt v. St. John's Evangelical Church of Burr Oak, Mich., 603 N.W.2d 816, 823 (Mi. App. 1999) (accord, because plaintiff could not establish any imbalance of power in the relationship or explain why she would repose trust in a minister without resorting to religious facts); Langford v. Roman Catholic Diocese of Brooklyn, 677 N.Y.S.2d 436 (N.Y. Sup. Ct. 1998) (accord); H.R.B. v. J.L.G., 913 S.W.2d 92, 98 (Mo. Ct. App. 1995) (accord); Schieffer v. Catholic Archdiocese of Omaha, 508 N.W.2d 907, 911 (Neb. 1993) (accord).

[9] The courts holding that the law could impose a fiduciary relationship between specific, child-sexual-abuse victims and religious institutions or clergy include Sanders v. Casa View Baptist Church, 134 F.3d 331, 337 (5th Cir. 1998) (interpreting Texas law, permitted breach of fiduciary duty claim against minister, because claim arose out of a counseling relationship, not merely a priest-parishioner relationship); Martinelli v. Bridgeport Roman Catholic Diocesan Corp., 196 F.3d 409, 430 (2d Cir. 1999) (interpreting Connecticut law, upheld jury's finding that fiduciary relationship existed between plaintiff and diocese, because diocese sponsored and encouraged the abusive priest's contact with parish youth, plaintiff attended a Catholic school within diocese, participated in church activities, and had been taught in catechism classes to trust and respect the bishop of the diocese); Fortin v. The Roman Catholic Bishop of Portland, 871 A.2d 1208, 1220 (Me. 2005) (finding plaintiff had a fiduciary relationship with diocese based upon his "prolonged and extensive

concluded that the number of courts recognizing a confidential relationship equaled, if not exceeded, the number of courts refusing to do so. *Id.* at 770.

In the twelve years since *Liberatore*, as the trial court in the instant matter recognized, the trend is increasingly in favor of allowing plaintiffs to assert individualized, confidential relationships between themselves and their religious institutions. Indeed, a federal district court, when faced with a case similar to Ms. Rice's suit, coined the phrase "parishioner-plus rule" to describe

---

involvement with the church as a student and altar boy," which distinguished him from a plaintiff "who asserts nothing more than general membership in a religious organization;" "[a] child who is both a student and an altar boy is subject to the supervision, control and authority of the Diocese on a daily basis. At its very core, this is a relationship marked by the 'great disparity of position and influence between the parties' that is a hallmark of a fiduciary relationship"); *F.G. v. MacDonell*, 696 A.2d 697, 704 (N.J. 1997) (holding that plaintiff stated sufficient facts for a fiduciary duty against church rector, because he was counseling parishioner); *Destefano v. Grabrian*, 763 P.2d 275, 289 (Colo. 1988) (finding priest who was counseling plaintiff entered into a fiduciary relationship); *Erickson v. Christenson*, 781 P.2d 383, 386 (Or. App. 1989) (recognizing fiduciary relationship where pastor seduced plaintiff through a counseling relationship); *Mabus v. St. James Episcopal Church*, 884 So.2d 747, 757, 760–61 (Miss. 2004) (affirming trial court's finding that plaintiff's claim of fiduciary relationship could proceed, based upon the priest allegedly having used parishioner's trust in him to his own advantage); *Moses v. Diocese of Colorado*, 863 P.2d 310, 321 n. 13 (Colo. 1993) (stating fiduciary relationship existed when diocesan defendants "occupied a position of superiority, assumed a duty to act in good faith, and then breached their duty"); and *Malicki v. Doe*, 814 So.2d 347 (Fla. 2002) (concluding that a plaintiff could prove a confidential relationship with a priest and/or diocese, and, to disallow such a theory would grant the church an unconstitutional immunity from lawsuits per the First Amendment's antiestablishment clause).

that majority position.[10]  Doe v. Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints, No. 1:09-CV-00351-BLW, 2012 WL 3782454, at 9 (D. Id. 2012).  Under the parishioner-plus rule, "a parishioner-plaintiff must submit facts demonstrating that his relationship with the church differed from other general parishioners' relationship with the church."  Id.

Doe alleged his church-appointed scoutmaster had sexually abused him.  Reaching the same conclusion as in Liberatore, the district court said, "Idaho law requires that the court examine the particulars of Doe and the Church Defendants' relationship to determine whether a jury could reasonably find that a special relationship of trust and confidence existed between Doe and the Church."  Id. at 10.

The court denied the church's motion for summary judgment, because:

> (1) [Doe] was a minor child when he was allegedly abused by [his scoutmaster]; (2) [Doe] was an active and regular participant in camping trips and other activities provided through a Church-sponsored organization; (3) [Doe] was strongly encouraged by the Church to participate in those camping trips and activities; and (4) the Church allegedly knew of the specific danger that [Doe's scoutmaster] posed. Also, the Church taught Doe to respect and trust his Church and Scout youth leaders.  And presumably, Doe's parents trusted [the scoutmaster] enough, in his role as a Church and Scout leader, to allow him to take Doe on overnight camping trips and individual day trips.  On these scouting

_____

[10] The United States District Court for the District of Idaho is the only court that we found to use the term "the parishioner-plus rule" to encapsulate the type of confidential relationship that Ms. Rice alleges.  For ease of discussion, we adopt the Doe Court's nomenclature, even though the other cases we discuss below do not specifically refer to their similar conclusions as "the parishioner-plus rule".

> trips, Doe's parents entrusted [the scoutmaster] to ensure Doe's safety and act as his caretaker.
>
> Additionally, the Church's alleged knowledge of [the scoutmaster's] dangerousness is a factor triggering a duty to disclose simply by virtue of the informational disparity . . . .

Id. Thus, the Presiding Bishop of LDS Court applied the parishioner-plus rule and submitted the issue of whether there was a confidential relationship to the jury.

On allegations nearly identical to those in Ms. Rice's amended complaint, an Illinois appellate court also applied the parishioner-plus rule to a secular organization. See Doe v. Boy Scouts of America, 66 N.E.3d 433 (Ill. App. 1st 2017), (concluding a reasonable jury could find plaintiff reposed his trust in the Boy Scouts organization and that the Boy Scouts accepted his trust, thus establishing a confidential relationship); see also Wisniewski v. Diocese of Belleville, 943 N.E.2d 43 (Ill. App. 3d 2011) (accord, as to priest and diocese). Illinois courts, therefore, applies the parishioner-plus rule when deciding if confidential relationships exist between clergy and parishioners, religious institutions/hierarchy and parishioners, as well as secular organizations and their members.[11]

_____

[11] Our research also revealed that Kansas refuses to apply the parishioner-plus rule. In Doe v. Popravak, 421 P.3d 760, 771 (Kan. App. 2017), the court opined that, if being an altar server and trusting the diocese "were sufficient to establish a fiduciary relationship, most priest or pastor relationships with parishioners would qualify." Id. The Kansas court decided there was no confidential relationship, as a matter of law. In Pennsylvania,

The parishioner-plus rule reflects Pennsylvania law and the precedents of this Court. We find the rationale of those courts that apply the rule to be highly persuasive, especially Liberatore and Presiding Bishop of LDS. When a plaintiff alleges facts beyond a general relationship of priest (or religious institution)/parishioner, those facts bring the relationship within the scope of the parishioner-plus rule. Whether a parishioner can prove sufficient facts to show that a confidential relationship exists (or existed) between the parishioner and a priest, the religious institution's corporate structure, and/or the religious institution's leadership, is for the jury to decide. If such a relationship is proven, it would then impose affirmative duties upon the superior party (in this case, the Diocesan Defendants) to act in the best interests of the inferior party (here, Ms. Rice). "The party in whom the trust and confidence are reposed must act with scrupulous fairness and good faith in his dealings with the other and refrain from using his position to the other's

_____

our courts have held that this is "a question of fact to be established by the evidence." Biddle v. Johnsonbaugh, 664 A.2d 159, 162 (Pa. Super. 1995). See also In re Estate of Scott, 316 A.2d 883, 885 (Pa. 1974) (stating the "concept of a confidential relationship cannot be reduced to a catalogue of specific circumstances, invariably falling to the left or right of a definitional line."). Thus, Popravak does not comport with Pennsylvania jurisprudence on confidential relationships.

Also, California has long-held that "confidential relations are presumed to exist between priest and parishioner," as a matter of law. Martin v. Gross, 2016 WL 309861 *4 (7th Cal. App. 2016) (quoting In re Miller's Estate, 60 P.2d 492, 497 (1st Cal. App. 1936). The parishioner-plus rule would be redundant in that state.

detriment and his own advantage." Basile v. H & R Block, Inc., 777 A.2d 95, 101 (Pa. Super. 2001) (citation and some punctuation omitted).

If the jury decides that a confidential relationship existed between Ms. Rice and the Diocesan Defendants, then the Diocesan Defendants had a duty to disclose their role in the cover-up to her. At that point, the jury would then need to determine whether, beginning in the 1970s and continuing until the 2016 Grand Jury Report, the Diocesan Defendants concealed their own, intentional acts from Ms. Rice. In other words, it is a question of fact for the jury as to whether the Diocesan Defendants breached their fiduciary duty to disclose their cover-up to Ms. Rice.

While any claims that Ms. Rice may have had for vicarious liability or negligence likely expired long ago, her intentional-tort actions may survive under the doctrine of fraudulent concealment, for the Diocesan Defendants' silence could constitute an estoppel under that doctrine. We have said "mere silence in the absence of a duty to speak cannot suffice to prove fraudulent concealment." Lange v. Burd, 800 A.2d 336, 339 (Pa. Super. 2002). The converse of such a statement is also correct, because fraud may be "brought about by . . . silence when good faith required expression." In re Reichert's Estate, 51 A.2d at 617–618 (Pa. 1947). Ms. Rice may have reasonably taken the Diocesan Defendants' silence to mean that they had not committed any deliberate acts of fraud or conspiracy. Thus, she, relying upon the Diocesan Defendants' silence, may have reasonably relaxed her vigilance or deviated from her right of inquiry into those intentional torts.

To prove fraudulent concealment, Ms. Rice will need to convince a jury of three things. She must show (1) a confidential relationship with the Diocesan Defendants; (2) that the defendants did not disclose their intentional acts of fraud and conspiracy; and (3) that such nondisclosure would cause a reasonable person, in her positon, to relax her vigilance or to deviate from her right of inquiry into the alleged intentional torts. Ms. Rice has pleaded facts satisfying all three.

First, under the parishioner-plus rule, she avers facts from which a jury might reasonably conclude that there was a confidential relationship between her and the Diocesan Defendants. At the time of the alleged assault, Ms. Rice was a young child, and the Diocesan Defendants were her educators through her enrollment at McNelis Catholic School. First Amended Complaint at 4. She alleges the Diocesan Defendants "were in a superior position" to her, and that she occupied the inferior "position of weakness, inequality, without" knowledge or information. Id. at 2, 13. The Diocesan Defendants were therefore allegedly able "to receive sensitive information regarding immoral conduct pertaining to Bodziak," which she lacked "the ability to obtain because of the Diocesan Defendants' success in keeping critical information from the public." Id.

Ms. Rice also asserts that the Diocesan Defendants taught her to trust and to obey priests, including Fr. Bodziak. Id. at 3. During this period, she cleaned the rectory, played the parish organ, and sang at masses. From all of the forgoing facts, jurors might find Ms. Rice personally displayed a

"weakness, dependence, or trust, justifiably reposed" in the Diocesan Defendants and their priests. Frowen at 417. Such allegations, if proven, establish that "the parties [did] not deal on equal terms . . . ." Frowen, 425 A.2d at 416. We express no opinion on whether this fact-based relationship arose; we only opine that, under the facts of Ms. Rice's complaint, it may have arisen if she proves her allegations at trial.

Second, Ms. Rice avers that the Diocesan Defendants failed to disclose their role in deliberately exposing her to harm. First Amended Complaint at 8-9. Her complaint, therefore, satisfied the second prong of the above test.

Third, Ms. Rice has alleged facts that, if proven, could lead a jury to infer that she reasonably believed no cover-up occurred and, thus, relaxed her vigilance or deviated from her right of inquiry. For example, she claims that the Diocesan Defendants' words and actions led her to believe "she was safe with priests in general and with [Fr.] Bodziak in particular, and that if there was conduct about which [she] or [her] family might be concerned, it was an isolated instance of spurious conduct, when in fact [Ms. Rice] was the victim of a known and preventable hazard that the Diocesan Defendants had created and allowed to continue." Id. at 9. Their silence, i.e., their refusal to enlighten her, may have reasonably led Ms. Rice to relax her vigilance or inquire no further regarding their intentional torts. The jury might find her reaction a reasonable response, because the Diocesan Defendants allegedly gave the impression they would never intentionally jeopardize the wellbeing of a child in their care. Id. at 10.

Thus, the Diocesan Defendants are not entitled to judgment on the pleadings, because a jury may find their silence was a fraudulent concealment. If so, the statute of limitations affords them no sanctuary on estoppel grounds. Ms. Rice's second appellate issue provides another basis for reversing the grant of judgment on the pleadings.

C.     The Count of Civil Conspiracy May Proceed on Its Own.

As her last issue, Ms. Rice argues the trial court erred in dismissing her cause of action for civil conspiracy. The trial court did not address this issue, because it apparently viewed this count as inseparable from Ms. Rice's two other tolling theories. Finding those theories barred, the trial court saw no reason to entertain her civil-conspiracy claim.

Ms. Rice contends this oversight was error. She argues the statute of limitations does not apply to her civil-conspiracy count, because it accrued in January 2016.

The Diocesan Defendants contend Baselice time-bars the count of civil conspiracy, because the Baselice plaintiff likewise included a civil-conspiracy count in his complaint. Diocesan Defendants' Brief at 24. They claim Baselice reduced civil conspiracy to a "secondary" cause of action that "cannot be brought where the primary cause of harm (the abuse) is time barred by the statute of limitations." Id. at 25. They assert this Court consistently rejected "cover-up causes of actions as secondary" to the primary tort of child abuse. Id.

The Diocesan Defendants again place too much stock in Baselice. They also mischaracterize Ms. Rice's conspiracy count as a "secondary" cause of action. There is no such thing as a "secondary" cause of action in this Commonwealth.

The Baselice Court never used the phrase "secondary cause of action." Pennsylvania's statute of limitations, if applicable to a cause of action, does not automatically bar all other causes of action that may arise from the same series of events. "[I]t is indisputable that the same or related facts may apply to more than one cause of action, and if one remedy is time-barred, a party may pursue his or her rights by means of the remedy which is not time-barred." Boettger v. Miklich, 599 A.2d 713, 716 (Pa. Cmwlth. 1991) (citing In re Hartranft's Estate, 26 A. 104 (Pa. 1893)), reversed on other grounds, 633 A.2d 1146 (Pa. 1993) (holding the Commonwealth Court improperly barred a plaintiff's suit under the "good-faith defense" of the Wiretapping Act,[12] because police unlawfully disclosed incepted data to taxing agencies without an authorizing court order).[13]

_____

[12] 18 Pa.C.S.A. §§ 5701-5781.

[13] We recognize that Baselice, relying upon Meehan, used the following language to describe the doctrine of fraudulent concealment:

> for a cause of action to accrue, the entire theory of the case need not be immediately apparent . . . as soon as appellant became aware of the alleged abuse, he should also have been aware that appellees, as the priest's employers, were potentially liable for that abuse." Meehan, 870 A.2d at 922

"The time within which a matter must be commenced under this chapter shall be computed . . . from the time the cause of action accrued." 42 Pa.C.S.A. § 5502(a) (emphasis added). Our legislature used the definite article "the" – not the indefinite articles "a" or "any" – to modify "cause of action." Thus, as the Boettger Court held, in calculating a timeframe under Pennsylvania's statute of limitations, courts must examine each, individual cause of action, separate and distinct from other alleged (or hypothetically allegeable) causes of action. Otherwise, we would rewrite 42 Pa.C.S.A. § 5502(a) as requiring plaintiffs to commence litigation from the time that any theoretical cause of action from a given set of facts might have accrued. Such an interpretation violates the clear and unambiguous language of Section 5502(a).

Accordingly, under Pennsylvania law, all causes of action are distinct. They accrue uniquely and separately on their own terms, and their statutes of

_____

> (citing Kelly v. Marcantonio, 187 F.3d 192, 201 (1st Cir.1999)) . . . . We agree that "to postpone the accrual of causes of action until appellant completed his investigation of all potential liability theories would destroy the effectiveness of the limitations period." Id. Therefore, the fraudulent-concealment exception is inapplicable and does not toll the statute of limitations in this matter.

Baselice, 879 A.2d at 279. Kelly, however, dealt with Rhode Island law, and its quotes appear in Meehan and Baselice after the plaintiffs' fraudulent-concealment theories failed under Pennsylvania law. Thus, the language from Kelly was superfluous dicta. More importantly, in light of Boettger v. Miklich, 599 A.2d 713, 716 (Pa. Cmwlth. 1991), and In re Hartranft's Estate, 26 A. 104 (Pa. 1893), the Kelly dicta was and is a misstatement of Pennsylvania law.

limitations run on their own schedules. Ms. Rice has aptly distinguished the statute-of-limitations timeframe for her count of civil conspiracy from that of any theoretical, unalleged torts of battery, negligent supervision, etc., as well as her other alleged torts of fraud.

We now apply the statute of limitations for civil conspiracy to Ms. Rice's amended complaint.

A "civil conspiracy is a combination of two or more persons to do an unlawful or criminal act or to do a lawful act by unlawful means or for an unlawful purpose." Fife v. Great Atlantic and Pacific Tea Co., 52 A.2d 24, 27 (Pa. 1947). As previously mentioned, the statute of limitations for civil conspiracy takes on the timeframe from the underlying illegality, here fraud. See, e.g., Kingston Coal, supra. Because the statute of limitations for fraud is two years under 42 Pa.C.S.A. § 5524(7), Ms. Rice's civil-conspiracy claim also has a two-year statute of limitations.

When "there are continuous and repetitious acts or trespasses as a part of a continuous conspiracy," the statute of limitations "does not begin to run until after the commission of the last act of the conspiracy." Baker v. Rangos, 324 A.2d 498, 510 (Pa. Super. 1974). The Diocesan Defendants do not dispute that proposition. However, they assert Ms. Rice is counting from the wrong, last act. They believe the last act of any conspiracy occurred when Fr. Bodziak committed his final battery against Ms. Rice, in 1981. Thus, the Diocesan Defendants interpret from the complaint that Ms. Rice is accusing

them of conspiring to batter her via Fr. Bodziak's sexual assaults.  This is a total misreading of the complaint.

Instead, Ms. Rice claims the Diocesan Defendants "conspired to conceal their knowledge of the problem within the Diocese and the history of sexual misconduct of [Fr.] Bodziak," and so exposed her to foreseeable harm.  First Amended Complaint at 14.  The heart of the allegation is that they conspired to do a lawful act (i.e., protecting their reputations) by unlawful means (i.e., fraudulently failing to disclose their own, intentional acts that placed her in harm's way originally and risked additional harms later in life).

Ms. Rice also alleges the Diocesan Defendants' conspiracy was ongoing, and she identifies January 2016 as its end date — i.e., Fr. Bodziak's removal from ministry.  See First Amended Complaint at 2, 7, 14.  Finally, she does not allege that the conspiracy's only harm was the molestation she suffered in the 1970s and 1980s.  She claims to have suffered a host of new injuries upon learning of the Diocesan Defendant's intentional, tortious conduct from the Grand Jury Report.  See id. at 10-11.  These alleged facts and resultant harms, if proven at trial, indicate the statute of limitations for her count of civil conspiracy did not begin to run until January 2016, at the earliest.  If Ms. Rice proves all of this to a jury, she filed her lawsuit well within the two-year statute of limitations for civil conspiracy on June 21, 2016.

Accordingly, we find merit to Ms. Rice's final appellate issue; granting judgment on the pleadings as to her civil-conspiracy claim was erroneous.

### III. Conclusion

All three of Ms. Rice's issues on appeal have merit. As to the discovery rule, the Supreme Court of Pennsylvania has supplanted this Court's Meehan-Baselice line of cases with Nicolaou. Only a jury may determine whether Ms. Rice reasonably investigated the Diocesan Defendants for their intentional torts. Also, Meehan and Baselice left room for the parishioner-plus rule in Pennsylvania. When, as here, a plaintiff alleges a fiduciary relationship with a religious institution or its leadership, based on her specific role(s) within the institution or based on a counselling relationship, this creates a jury question. If a jury finds sufficient facts to prove a confidential relationship, it may also find that the Church's silence constituted a fraudulent concealment. Finally, under Ms. Rice's alleged facts, she timely filed her third cause of action for civil conspiracy.

The Diocesan Defendants are not entitled to judgment on the pleadings based upon the statute of limitations.

Order granting judgment on the pleadings to the Diocesan Defendants reversed. Case remanded for further proceedings consistent with this Opinion.

Jurisdiction relinquished.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>6/11/2019</u>