J-A25036-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| PITNEY ROAD PARTNERS, LLC T/D/B/A REDCAY COLLEGE CAMPUSES I, | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : | |
| v. | : : : | |
| STEPHEN R. LAZUN | : | No. 203 MDA 2019 |

Appeal from the Order Entered January 25, 2019
in the Court of Common Pleas of York County
Civil Division at No(s): 2012-SU-000711

BEFORE: STABILE, J., McLAUGHLIN, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:                **FILED JANUARY 13, 2020**

Pitney Road Partners, LLC ("Pitney") t/d/b/a Redcay College Campuses I, appeals from the Order granting the Motion for summary judgment filed by Stephen R. Lazun ("Lazun"), a Pennsylvania attorney who formerly represented Pitney. We reverse and remand for further proceedings.

The trial court set forth the relevant factual and procedural history underlying this appeal in its Order granting Lazun's Motion for summary judgment, as follows:

> [Pitney, a Pennsylvania LLC based in Lancaster,] alleges that prior to December 16, 2011, it was the owner of Harrisburg Area Community College's ("HACC") Lancaster Campus[,] and HACC was [Pitney's] tenant. The parties entered into an original lease agreement in 1999[,] whereby [Pitney] obtained financing for the construction of the original classroom building on the Campus (["]Phase I Project["]). As part of its rent, HACC was responsible for paying the debt service [fee] on the financing obtained by [Pitney].

In 2003, [Pitney] and HACC entered into several new lease agreements whereby [Pitney] agreed to perform expansion and renovation projects on the Lancaster Campus. [Pitney] and HACC agreed to finance the expansion project by refinancing the existing debt service from the Phase I Project [(hereinafter, the "2003 Refinance"),] and [Pitney] also obtained bond financing. [Pitney] alleges that in the 2003 Refinance, [Pitney] and HACC agreed to equally share all costs associated with refinancing the debt service, as well as all savings derived from the refinancing. [Pitney] and HACC also agreed in the 2003 Refinance that HACC would pay the credit enhancement fee[,] because the fee was an interest expense. [Pitney] alleges that following the 2003 Refinance, the costs and savings were shared between [Pitney] and HACC.[1]

In 2008, [Pitney] retained … Lazun from the firm Hartman, Underhill & Brubaker LLP[,] to represent it in the issuance of a new series of notes, which would be used to refinance the 2003 bond debt on the Lancaster Campus (the ["]2008 Refinance["]). [Notably, Pitney] alleges that it informed [Lazun] that [Pitney] and HACC wanted to structure the 2008 Refinance in the same manner as the 2003 Refinance, including the provisions that the parties would equally share all costs and savings derived from the refinance[,] and that HACC would be responsible for the credit enhancement fee.

[Pitney] alleges that [Lazun] performed approximately 130 hours of work between April 18, 2008 and June 25, 2008[,] on the 2008 Refinance matter[,] without a written engagement agreement. On June 27, 2008, [Pitney and HACC] signed the 2008 Refinance.[2] [Pitney] alleges that it proceeded with issuing the new series of notes based upon its belief that [Lazun] had structured the 2008 Refinance in accordance with the 2003

_____

[1] In 2007, Pitney filed suit against HACC concerning certain expenses it had incurred regarding the HACC Lancaster Campus expansion project. The parties entered into an agreement to arbitrate the dispute, which we will hereinafter refer to as the "Pitney/HACC Arbitration."

[2] The 2008 Refinance was not a single contract, but rather, was composed of several separate transactional documents, spanning numerous pages. Additionally, other attorneys and professionals aside from Lazun were involved in drafting some of these documents.

Refinance. However, [Pitney] alleges that [Lazun] failed to review the 2003 Refinance documents and did not structure the 2008 [Refinance] documents in the same manner as the 2003 [Refinance] documents[,] when drafting the 2008 Refinance documents.

[Pitney] claims that as a result of [Lazun's] failure to exercise due diligence and care, [Pitney] was required to pay half of all the costs of the 2008 Refinance, but was not able to share in half of all the savings, resulting in [Pitney] being deprived of over $350,000 in additional savings. [Pitney] alleges that it, not HACC, was also forced to pay the credit enhancement fee[,] in the amount of $508,876.

On February 17, 2012, [Pitney] filed a Praecipe for writ of summons in legal malpractice. On March 19, 2012, [Pitney] filed a Complaint[,] which alleged a single count of professional negligence against [Lazun,] alleging[, in sum,] that he failed to draft the 2008 Refinance documents as [Pitney] wished….

Order and Opinion, 11/8/18, at 2-4 (footnotes added, some capitalization altered).

Of particular importance to the instant appeal is a letter dated December 4, 2008 (hereinafter the "2008 Letter"). Stuart Savin ("Savin"), the HACC Dean and Campus Vice President, sent the 2008 Letter to Robert Redcay ("Redcay"), the president of Pitney, in response to a letter that Redcay had sent to HACC. The 2008 Letter disputed Redcay's assertion in his letter that HACC owed Pitney additional rent payments to compensate Pitney for

increased interest costs.[3]  The 2008 Letter referenced and cited provisions of certain 2008 Refinance documents.

Following the 2008 Refinance, in 2010, arbitration hearings commenced in the Pitney/HACC Arbitration.  On September 29, 2011, the arbitration panel entered a final arbitration award, ruling that the operative 2008 Refinance documents, which Pitney alleges were drafted by Lazun, did not require HACC to share with Pitney the savings derived from the 2008 Refinance, or to pay the credit enhancement fee (hereinafter, the "2011 arbitration award").  According to Pitney, it was not until the 2011 arbitration award that it became aware of Lazun's purported negligence in connection with the 2008 Refinance.

On June 7, 2012, Lazun filed Preliminary Objections to Pitney's Complaint, which the trial court later denied.  Lazun subsequently filed an Answer and New Matter, to which Pitney filed a Reply.

On May 4, 2018, Lazun filed a Motion for summary judgment asserting, *inter alia*, that Pitney's cause of action was barred by the applicable two-year statute of limitations.[4]  Pitney filed an Answer in opposition, asserting that the

---

[3] Specifically, Savin stated that "[c]ontrary to your contentions, no additional rent is required for the period of July, 2008 through September, 2008."  Savin went on to explain that this was because "Pitney and HACC had expressly agreed what the rent was to be" for this time.

[4] The statute of limitations for claims sounding in legal malpractice is two years.  **See Wachovia Bank, N.A. v. Ferretti**, 935 A.2d 565, 571 (Pa. Super. 2007) (citing 42 Pa.C.S.A. § 5524(3)).  Pitney did not claim breach of contract, which has a four-year statute of limitations.  **See id.**

statute of limitations was tolled until September 29, 2011, *i.e.*, the date of the arbitration award, which was the first time that Pitney reasonably could have discovered Lazun's negligence in connection with the 2008 Refinance. Lazun filed a Reply Brief, wherein he countered that the statute of limitations had not been tolled. Lazun further claimed that even if it was, it was tolled only until December 4, 2008, *i.e.*, the date of the 2008 Letter, at which time Pitney knew, or should have reasonably known, that there was a problem with the 2008 Refinance documents, which implicated Lazun's representation of Pitney.

By an Order and Opinion entered on November 8, 2018, the trial court granted Lazun's Motion for summary judgment. In sum, the court agreed with Lazun's above-mentioned claim concerning the 2008 Letter putting Pitney on notice. Pitney timely filed a Notice of Appeal,[5] followed by a court-ordered Pa.R.A.P. 1925(b) Concise Statement of errors complained of on appeal.

Pitney now presents the following issue for our review: "Should the trial court's [O]rder granting summary judgment in favor of Lazun on the basis of the discovery rule be reversed[,] where reasonable minds could disagree about whether the [] 2008 [L]etter put Pitney on notice of Lazun's malpractice?" Brief for Appellant at 2.

---

[5] The trial court allowed reconsideration of the November 8, 2018 Order, which granted Lazun's Motion for summary judgment. By an Order entered on January 25, 2019, the trial court declined to disturb the November 8, 2018 Order; Pitney timely filed a Notice of Appeal from the former Order.

We apply the following standard in reviewing the grant of a motion for summary judgment:

> [S]ummary judgment is only appropriate in cases where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Pa.R.C.P. 1035.2(1). When considering a motion for summary judgment, the trial court must take all facts of record[,] and reasonable inferences therefrom[,] in a light most favorable to the non-moving party[,] and must resolve all doubts as to the existence of a genuine issue of material fact against the moving party. An appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion. Because the claim regarding whether there are genuine issues of material fact is a question of law, our standard of review is *de novo* and our scope of review is plenary.

*Nicolaou v. Martin*, 195 A.3d 880, 891-92 (Pa. 2018) (some citations omitted). "Only when the facts are so clear that reasonable minds could not differ can a trial court properly enter summary judgment." *Straw v. Fair*, 187 A.3d 966, 982 (Pa. Super. 2018) (citation omitted).

Summary judgment may properly be entered in favor of a defendant when the plaintiff's cause of action is barred by the statute of limitations. *Brooks v. Sagovia*, 636 A.2d 1201, 1202 (Pa. Super. 1994). "It is the duty of a party asserting a cause of action to use all reasonable diligence to be properly informed of the facts and circumstances upon which a potential right of recovery is based and to institute suit within the prescribed statutory period." *Booher v. Olczak*, 797 A.2d 342, 345 (Pa. Super. 2002). "The requirement of reasonable diligence is not an absolute standard but, rather, is what is expected from a party who has been given reason to inform himself of the facts upon which his right of recovery is premised." *Saksek v. Janssen*

- 6 -

*Pharm., Inc.*, 2019 Pa. LEXIS 6480, at *15 (Pa. 2019) (citation and quotation marks omitted).  Moreover, "the trigger for the accrual of a legal malpractice action, for statute of limitations purposes, is not the realization of actual loss, but the occurrence of a breach of duty."  *Commc'ns Network Int'l v. Mullineaux*, 187 A.3d 951, 960 (Pa. Super. 2018) (citation omitted) (collecting cases and explaining the "occurrence rule").

However, the statute of limitations may be tolled pursuant to the "discovery rule," upon which Pitney relies.  This rule

> provides that where the existence of the injury is not known to the complaining party and such knowledge cannot reasonably be ascertained within the prescribed statutory period, the limitations period does not begin to run until the discovery of the injury is reasonably possible.  The statute begins to run in such instances when the injured party possesses sufficient critical facts to put him on notice that a wrong has been committed and that he need investigate to determine whether he is entitled to redress.  The party seeking to invoke the discovery rule bears the burden of establishing the inability to know that he or she has been injured by the act of another despite the exercise of reasonable diligence.

*Id.* at 961 (citation and emphasis omitted); *see also id.* (explaining that "the statute of limitations in a legal malpractice claim begins to run when the attorney breaches his or her duty, and is tolled only when the client, despite the exercise of due diligence, cannot discover the injury or its cause." (citation and emphasis omitted)).

The Pennsylvania Supreme Court has further explained that

> Pennsylvania's formulation of the discovery rule represents a more narrow approach and places a greater burden on plaintiffs than other jurisdictions[,] because the commencement of the limitations period is grounded on "inquiry notice" that is tied to

actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the injury, the fact of actual negligence, or precise cause.

*Nicolaou*, 195 A.3d at 892 (citations and some quotations omitted). The applicability of the discovery rule may be resolved "at the summary judgment stage *where reasonable minds could not differ* on the subject." *Wilson v. El-Daief*, 964 A.2d 354, 361-62 (Pa. 2009) (emphasis added); *see also Gleason v. Borough of Moosic*, 15 A.3d 479, 485 (Pa. 2011).

Importantly here, this Court, interpreting *Nicolaou*, *supra*, recently observed that the Supreme "Court emphasized the jury's prerogative, under the discovery rule, to decide whether a plaintiff's efforts to investigate a defendant were sufficiently reasonable to toll the statute of limitations." *Rice v. Diocese of Altoona-Johnstown*, 212 A.3d 1055, 1059 (Pa. Super. 2019); *see also Nicolaou*, 195 A.3d at 894 (stating that the determination of whether a plaintiff exercised reasonable diligence relevant to the application of the discovery rule is generally a question for the jury); *Fine v. Checcio*, 870 A.2d 850, 858 (Pa. 2005) (holding that because application of the discovery rule "involves a factual question as to whether a party was able, in the exercise of reasonable diligence, to know of his injury and its cause, ordinarily, a jury is to decide it.").

In the instant case, the trial court explained its reasons for determining that the discovery rule was of no avail to Pitney as follows:

We believe that this case is similar to the [Superior Court's decision in ***Robbins & Seventko Orthopedic Surgs. v. Geisenberger***, 674 A.2d 244 (Pa. Super. 1996)]. In ***Geisenberger***, plaintiffs retained defendants' law firm to incorporate its practice and to prepare and file an employee pension plan with the IRS. [***Id.***] at 244. Defendant John Gibbel submitted pension plan forms to the IRS in September 1977. ***Id.*** That same month, plaintiff received the pension plan forms back with instructions that they be resubmitted. ***Id.*** On October 17, 1978, defendant S.R. Zimmerman, III[,] sent an amended pension plan with an application for determination to the IRS. ***Id.***

On May 4, 1983, "[plaintiffs] were informed by the IRS that the pension plan had failed to qualify, and that deductions made to it in 1976, 1977, 1978, and 1979 were disallowed." ***Id.*** Plaintiffs' new counsel filed an administrative appeal with the IRS. ***Id.*** On October 8, 1986, plaintiffs and the IRS reached a settlement agreement whereby the IRS accepted amendments to the plan for 1978 and 1979, but refused to accept amendments relating back to 1976 and 1977. ***Id.*** Plaintiffs also submitted a Form 870-AD Waiver of Restriction on Assessment and Collection. ***Id.*** On September 22, 1986, plaintiffs received notice that the IRS accepted the Form 870-AD Waiver[,] and the case relating to the tax years 1976 through 1979 was closed. ***Id.***

Defendants were originally notified of the problem through a letter from the IRS dated February 24, 1986. ***Id.*** "On April 15, 1986, [defendants] informed the [plaintiffs] that they believed the IRS's objections to the plan were simple to amend." ***Id.*** Plaintiffs hired another firm to amend the plan in January 1987. ***Id.*** On January 21, 1988, plaintiffs' new firm, Dechert, Price, and Rhoads, contacted defendants and informed them that plaintiffs were precluded from amending and resubmitting the plan because they filed the waiver form. ***Id.***

On December 12, 1988, plaintiffs issued a writ of summons against defendants and filed a complaint on December 22, 1989. ***Id.*** Plaintiffs alleged that defendants "were negligent in preparing and filing the employee pension plan with the IRS for the 1976 and 1977 tax years." ***Id.*** Defendants filed a motion for summary judgment arguing that plaintiff's action was barred by the statute of limitations[,] and the trial court agreed, granting defendant's motion. ***Id.*** at 245-46.

It was noted by the Superior Court that "the trial court agreed with the [plaintiffs] that the statute of limitations was tolled during its administrative appeal with the IRS." *Id.* at 246. The trial court initially "concluded that the statute began to accrue on September 22, 1986, when the IRS informed the [plaintiffs] that it had accepted their waiver." *Id.* The trial court granted summary judgment because plaintiffs failed to bring the malpractice suit within two years of the date of September 22, 1986, as they did not file their complaint until 1989. *Id.*

The Superior Court agreed with the trial court that the motion for summary judgment should have been granted, but disagreed with the trial court that the statute of limitations was tolled during the administrative appeal with the IRS. The Superior Court held that the proper accrual date was actually May 4, 1983, "when the IRS notified the [plaintiffs] that the deductions for the pension plan were disallowed." *Id.* The Court held that plaintiffs "acquired knowledge of the harm on May 4, 1983, when the IRS notified them that the pension deduction was disallowed." *Id.* at 377.

In the present case, the record shows that on December 4, 2008, a representative from HACC sent [the 2008] Letter to [Pitney,] which indicated a disagreement between the parties over the amount of rent that was to be paid under the 2008 Refinance. The [2008] Letter references provisions from the 2008 Refinance Agreement that [Pitney and HACC] signed. [Pitney's] Complaint alleges that [Lazun] had a duty to structure the 2008 Refinance in the same manner as the 2003 Refinance[,] to ensure that [Pitney] and HACC would equally share in all the savings and that HACC would pay the credit enhancement fee.

We find that upon receiving [the 2008] Letter, [Pitney] reasonably should have been aware that there was an issue with the 2008 Refinance Agreement[,] and should have pursued some type of action to discover the extent of the injury. [Pitney] has failed to indicate in its brief that it attempted to review the documents after receiving this [2008 L]etter. We believe a review of the documents would have revealed that the 2003 Refinance and the 2008 Refinance were not structured in a similar manner[,] and should have alerted [Pitney] that there was an issue with the agreement. We find that [Pitney] should have been alerted of an issue upon receiving [the 2008] Letter….

We do not agree with [Pitney] that the statute of limitations should be tolled until after the [Pitney/HACC Arbitration] panel issued its [2011 arbitration] award…. The **Geisenberger** Court expressly rejected an argument made by appellants in that case that the statute of limitations should be tolled while an appeal to an underlying action is pending. [**See Geisenberger**,] 674 A.2d at 376. Pennsylvania law requires us to determine when the breach occurred and whether the plaintiff would have been unable to discover the injury[,] even exercising due diligence[,] until after the statute of limitations had passed.

In the present matter, we find that [Pitney] has failed to demonstrate that it acted diligently in discovering the injury in this matter. Therefore, we find that the discovery rule should only be extended to December 4, 2008….

Because [Pitney] did not file its Complaint until March 19, 2012, we find that it is beyond the two[-]year statute of limitations and, therefore, [Lazun] is entitled to judgment as a matter of law.

Order and Opinion, 11/8/18, at 13-17 (some capitalization altered, footnote citation moved to body).

Pitney argues, to the contrary, that the trial court improperly applied the discovery rule, and usurped the role of the jury, where the evidence was far from clear that Pitney should have reasonably discovered that Lazun may have committed malpractice in connection with his work on the 2008 Refinance, prior to the 2011 arbitration award. **See** Brief for Appellant at 22-24, 28-34 (relying heavily upon **Nicolaou**, **supra**). Pitney argues that the trial court erred in finding, as a matter of law, that the 2008 Letter should have put Pitney on notice of Lazun's alleged malpractice:

Pitney's claims [against Lazun] are based on two specific failures by Lazun with respect to the 2008 Refinance: his failure to ensure that the transaction documents required HACC to pay the upfront credit enhancement fee[,] and his failure to ensure that HACC was

required to split any interest savings derived from the 2008 Refinance with Pitney.

* * *

The [] 2008 [L]etter cited by the trial court as the sole basis for holding that Pitney knew or should have known[,] prior to 2011[,] of Lazun's negligence had nothing to do with sharing interest rate savings or the upfront letter of credit fee. The trial court held that this [2008 L]etter put Pitney on notice of "issues" with the "2008 Refinance Agreement" drafted by Lazun. But this letter had nothing to do with any "issues" with the 2008 Refinance at all.[FN] Rather, the letter dealt with the question of the amount, if any, of additional rent HACC was required to pay during a short three-month period from July to September 2008.

> [FN] There is no single "2008 Refinance Agreement[,]" as the [trial] court repeatedly suggested in its Opinion. Rather, the 2008 Refinance was a complex transaction that involved 42 different documents[,] comprising hundreds of pages. This misstatement by the trial court is not a simple matter of semantics. The trial court's repeated references to the "2008 Refinance Agreement" demonstrate[s] that the trial court failed to appreciate the complexity of the transaction and the documents associated with it. This is a critical reason that a jury, rather than the court, should be permitted to determine whether Pitney knew or should have known of Lazun's negligence.

Brief for Appellant at 29-30 (footnote in original, citations to record omitted).

Pitney further asserts that, in the letter that Redcay/Pitney had sent to HACC prior to HACC's responsive 2008 Letter,

Pitney was telling HACC that [HACC] was obligated to pay additional interest expenses [as part of HACC's rent], which has nothing to do with Lazun's failure to make sure interest savings were shared equally[; i]ndeed, the provision relied upon by HACC in the [] 2008 [L]etter[] was not written by Lazun.

*Id.* at 32 (footnote moved). Pitney argues that it has "never alleged[] that Lazun did anything wrong with respect to the rent provisions[,]" and there is "no reason that HACC's refusal to honor its rent obligations should have triggered a complete investigation by Pitney into Lazun's work." *Id.* at 32-33. Pitney urges that "[a] jury could certainly find that HACC's short payments of rent for a period of time in 2008 and 2009 was not a 'clue' that should have triggered an inquiry into Lazun's work." Reply Brief for Appellant at 14.

> Finally, Pitney argues that
>
> [t]he trial court's holding[,] that the 2008 [L]etter concerning the amount of HACC's rent triggered a duty by Pitney to scour the hundreds of pages of complex financing documents associated with the 2008 Refinance for potential negligence by Lazun on unrelated issues[,] is contrary to law which … requires an attorney representing a client in a transaction to fully understand all the documents and to explain them to the client. The law certainly does not require transactional clients to hire one lawyer after another to check on the work of the prior attorney.

Brief for Appellant at 42-43; *see also id.* at 42 (collecting cases).

We are persuaded by Pitney's arguments. Unlike the trial court, we cannot determine that the record, viewed in a light most favorable to Pitney, is so clear that "reasonable minds could not differ on the subject[,]" *Wilson*, *supra*, *i.e.*, as to whether the 2008 Letter should have reasonably put Pitney on notice of Lazun's alleged malpractice concerning the 2008 Refinance. The trial court thus erred in usurping the province of a jury to make a finding concerning this matter regarding the 2008 Letter. *See Nicolaou*, 195 A.3d at 894-95 (holding that because there was a genuine issue of material fact

and reasonable minds could differ as to whether the plaintiff exercised reasonable diligence in determining the cause of her injury, Pennsylvania's general rule that the issue should be submitted to the jury applied in the case); *Rice*, *supra* (stating that the *Nicolaou* "Court emphasized the *jury's prerogative*, under the discovery rule, to decide whether a plaintiff's efforts to investigate a defendant were sufficiently reasonable to toll the statute of limitations." (emphasis added)).[6]    Moreover, we determine that *Geisenberger* is inapposite to this appeal.  *See* Brief for Appellant at 36-40 (discussing and distinguishing *Geisenberger*).

Based on the foregoing, we reverse the trial court's Order granting Lazun's Motion for summary judgment and remand for further proceedings.

Order reversed; case remanded for further proceedings; Superior Court jurisdiction relinquished.

_____

[6] The *Rice* Court held that because reasonable minds could differ as to whether the plaintiff exercised due diligence in a case involving alleged sexual molestation by a priest, as well as the alleged cover-up by the Diocese, under *Nicolaou*, the issue was for the jury to decide; this Court thus reversed the trial court's grant of judgment on the pleadings in favor of the Diocese. *Rice*, 212 A.3d at 1066; *see also id.* (emphasizing that "[t]o find the discovery rule inapplicable here, we would need to engage in the fact-finding and inference-drawing functions that *Nicolaou* teaches are preserved for the jury." (citation and quotation marks omitted)).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/13/2020