IN THE SUPREME COURT OF PENNSYLVANIA
WESTERN DISTRICT

**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| RENEE' A. RICE | : | No. 3 WAP 2020 |
| | : | |
| | : | Appeal from the Order of the |
| v. | : | Superior Court entered June 11, |
| | : | 2019 at No. 97 WDA 2018, |
| | : | reversing the Order of the Court of |
| DIOCESE OF ALTOONA-JOHNSTOWN, | : | Common Pleas of Blair County |
| BISHOP JOSEPH ADAMEC (RETIRED), | : | entered December 15, 2017 at No. |
| MONSIGNOR MICHAEL E. SERVINSKY, | : | 2016 GN 1919, and remanding. |
| EXECUTOR OF THE ESTATE OF BISHOP | : | |
| JAMES HOGAN, DECEASED, AND | : | ARGUED:  October 20, 2020 |
| REVEREND CHARLES F. BODZIAK | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: DIOCESE OF ALTOONA- | : | |
| JOHNSTOWN, BISHOP JOSEPH ADAMEC | : | |
| (RETIRED), MONSIGNOR MICHAEL E. | : | |
| SERVINSKY, EXECUTOR OF THE | : | |
| ESTATE OF BISHOP JAMES HOGAN, | : | |
| DECEASED | : | |

## OPINION

**JUSTICE DONOHUE**                    **DECIDED:  JULY 21, 2021**

In this appeal, we address the proper application of the statute of limitations to a

tort action filed by Renee' Rice ("Rice") against the Diocese of Altoona-Johnstown and its

bishops (collectively, the "Diocese") for their alleged role in covering up and facilitating a

series of alleged sexual assaults committed by the Reverend Charles F. Bodziak.  Rice

alleged that Bodziak sexually abused her from approximately 1974 through 1981.  She

did not file suit against Bodziak or the Diocese until June 2016, thirty-five years after the alleged abuse stopped.

For the reasons set forth herein, we conclude that a straightforward application of Pennsylvania's statute of limitations requires that Rice's complaint be dismissed as untimely. Accordingly, we reverse the order of the Superior Court and reinstate the trial court's dismissal of the case.

## I. Procedural History

## A. Rice's Complaint

Rice filed her initial complaint on June 20, 2016, asserting multiple claims, including breach of fiduciary duty, fraud, and conspiracy. Rice (born in 1967) and her family were members of St. Leo, a parish within the Altoona-Johnstown Diocese and she attended the affiliated Catholic school. First Amended Complaint, 8/16/2016, ¶¶ 21-23. Rice alleges that Father Bodziak was assigned to St. Leo's and began a "grooming" process which included taking Rice and other children on various youth activities. *Id.* ¶ 25. She contended that he first sexually assaulted her in 1974 when she was between eight or nine years old, placing his hand between her legs while the two were seated in a vehicle following one of these outings. *Id.* ¶ 26. She averred that he would routinely touch her private areas during subsequent outings, and on one occasion he kissed her and inserted his tongue into her mouth. *Id.* ¶¶ 27-28. At some unspecified point in time, Bodziak allegedly spoke to Rice's parents, requesting and receiving their permission to have Rice perform various chores at the rectory, where Bodziak resided. According to Rice, the assaults escalated at this point, as Bodziak would supply Rice with alcohol and then fondle her genitalia and kiss her. On one occasion, he allegedly inserted his fingers

into her vagina. *Id.* ¶ 29. Bodziak assured Rice that the activities "were acceptable because he liked her and she was 'special.' " *Id.* ¶ 32. In her complaint, Rice alleged that these assaults initially occurred once or twice a month, and later rose to the level of approximately twice a week through 1981. *Id.* ¶ 33. Rice's complaint further alleged that Bishop Joseph Adamec served "as the Bishop or leader" of the Altoona-Johnstown Diocese from 1987 until 2011, while Bishop James Hogan filled that same role from 1966 through 1986. *Id.* ¶¶ 3-4. Rice alleged that both men were empowered to supervise and control all priests assigned to the diocese, including parish assignments. *Id.* ¶ 6.

Rice did not report Bodziak's abuse to the authorities until "the first half of 2006" when she "reported her history of sexual abuse by Bodziak to Defendants Adamec and the Diocese." *Id.* ¶ 43. By letter dated July 17, 2006, Bishop Adamec "invite[d] [Rice] to share that information through our diocesan process for reviewing allegations." Exhibit A to Complaint. The letter explained that Rice could seek assistance from Sister Marilyn Welch as a designated victims' advocate, who would help present the cases to the Diocesan Allegation Review Board. Rice did not respond.

In early 2014, the District Attorney of Cambria County issued a referral to the Office of Attorney General regarding reports of sexual abuse occurring within the Diocese of Altoona-Johnstown. On March 1, 2016, the 37th Investigating Grand Jury issued a report finding that hundreds of children were victimized by over fifty individual priests or religious leaders. The grand jury determined that "Bishops James Hogan and Joseph Adamec ... took actions that further endangered children" by returning priests to the ministry/parishes "with full knowledge they were child predators." Grand Jury Report at 6. The report discussed the existence of " 'secret archives' … used to hide scandalous information,

such as sex abuse by priests." *Id.* at 8 (quoting news coverage from the Tribune-Democrat newspaper). With respect to Bodziak in particular, the Report indicated that Bodziak had sexually abused other victims and that the Diocese had been made aware of these incidents. In her complaint, Rice averred that upon reading the Report, she learned for the first time "that the [Diocese] ha[s] a long history of protecting child predators at the expense of innocent and vulnerable children, and knew or should have known of Bodziak's sexual attraction to young children and his inappropriate physical contact with them." First Amended Complaint, 8/16/2016, at 46 (unnecessary capitalization omitted).

## B. The Trial Court and Superior Court Opinions

The Diocese filed an answer and new matter followed by a motion for judgment on the pleadings, raising the statute of limitations as a defense. The Diocese argued that as Bodziak's last alleged assault occurred in 1981 the statute of limitations expired long ago. In support, the Diocese relied on a line of cases stemming from the Superior Court's decision in *Meehan v. Archdiocese of Philadelphia*, 870 A.2d 912 (Pa. Super. 2005), which reasoned, in relevant part, that

> The child abuse is the injury in this matter, not the alleged cover-up by the Archdiocese (otherwise, any member of the Catholic Church could conceivably bring suit against the Archdiocese, absent any abuse, alleging injury from the Archdiocese's general conduct). Unlike traditional discovery rule cases where the injury, itself, is not known or cannot be reasonably ascertained, the plaintiffs' injuries, here, were known when the abuse occurred.
>
> The [Plaintiffs] are really claiming that they were unaware, not of their injury, but of a secondary cause of their injury (the primary cause being the individual who committed the abuse). The plaintiffs claim that a jury should determine if the plaintiffs should have investigated these secondary parties during the

limitations period or if the plaintiffs were unable, despite reasonable diligence, to bring suit against these secondary parties until 2002.

*Id.* at 920. *Accord Baselice v. Franciscan Friars Assumption BVM Province, Inc.*, 879 A.2d 270, 277 (Pa. Super. 2005) ("As in *Meehan,* appellant, here, is really claiming that he was unaware, not of his injury, but of a secondary cause of his injury[.]"). The trial court granted the motion, agreeing that "as in *Meehan* and *Baselice,* it was always known to the Plaintiff that the causes of her alleged injury were the actions of Defendant Bodziak and the Diocese overseeing him." Trial Court Opinion and Order, 12/15/2017, at 10.

The Superior Court reversed. *Rice v. Diocese of Altoona-Johnstown*, 212 A.3d 1055 (Pa. Super. 2019). The court concluded that the "discovery rule" and "fraudulent concealment" both applied and reversed the trial court. For the discovery rule analysis, the court held that Rice alleged sufficient facts to place the issues of notice and diligence to the jury. The Superior Court accepted that the relevant chronological event was when Rice could have learned of the cover-up, and not simply knowledge of the abuses as held by *Meehan*. The Superior Court concluded that "*Meehan*, *Baselice*, and their progeny reviewed child-sexual-abuse allegations in [a] vacuum[,]" a practice forbidden by *Nicolaou v. Martin*, 195 A.3d 880 (Pa. 2018), according to the Superior Court. *Id.* at 1064–65.

The panel proceeded to "apply *Nicolaou* to Ms. Rice's discovery-rule theory and alleged facts." *Id.* at 1066. The Superior Court established what it perceived as dueling sets of facts that must be submitted to the jury for fact-finding. On the one hand, the Diocese argued that the facts as pled in the complaint indicated that Rice knew of the injuries inflicted by Bodziak, that Bodziak was employed by the Diocese, and that the abuse occurred on church grounds. On the other, Rice argued "no reasonable person

would have suspected, much less investigated, the Diocesan Defendants for the torts she has alleged until the Grand Jury Report became public." *Id.* Extrapolating from its reading of *Nicolaou*, the Superior Court determined that applying the statute of limitations based on the Diocese's argument required viewing the Diocese's facts in a vacuum. The panel characterized the *Meehan* line of cases as "credit[ing] the facts favorable to the archdiocese and its hierarchy." *Id.* at 1065. According to the Superior Court, pursuant to *Nicolaou,* courts could no longer ignore inferences favorable to the plaintiffs' discovery-rule theory, which included, inter alia, Rice's assertion that she had no basis to suspect that the Diocese would cover up abuse and the massive investigative efforts needed to ultimately uncover the Diocese's transgressions. *Id.* at 1065–66. Accordingly, the panel determined that the jury must resolve the competing facts.

The Superior Court next addressed the fraudulent concealment argument. According to Rice she had a "special, confidential relationship" with the Diocese requiring it to disclose its knowledge of the cover-up to Rice. *Id.* at 1067. The Diocese argued that *Meehan* had previously rejected similar arguments. *Meehan*, 870 A.2d at 921–22 (noting that the plaintiffs alleged a relationship that "equates to a fiduciary relationship" and rejecting the fraudulent concealment doctrine). The Superior Court determined that the trial court's ruling "overextended *Meehan*." *Rice*, 212 A.3d at 1067. It viewed *Meehan* as rejecting a fraudulent concealment argument only in the context of the "regular" parishioner-church relationship shared by all members of the parish, whereas this case involves an individualized relationship between Rice and the Diocese based on, inter alia, her service "as a parish organist, cantor, and rectory cleaner, coupled with her young age, Catholic schooling, and the trust she placed in the Diocesan Defendants to guide and to

protect her." *Id.* at 1060. Adopting the nomenclature of *Doe v. Presiding Bishop of The Church of Jesus Christ of Latter-Day Saints*, 2012 WL 3782454 (D. Idaho 2012) (unpublished), the *Rice* panel concluded that Pennsylvania law would henceforth recognize the possibility of a "parishioner-plus" relationship. *See also Doe v. Liberatore*, 478 F. Supp. 2d 742, 753 (M.D. Pa. 2007) (predicting without discussion of the parameters of the duty that this Court would recognize a relationship between church and parishioner for purposes of the breach of fiduciary duty tort).

According to the Superior Court, if Rice could prove the relationship existed, the fraudulent concealment theory could then apply. It is not entirely clear from the Superior Court's opinion the extent to which it distinguished between affirmative acts that misled Rice versus the Diocese's obligation to come forward and reveal facts based on the purported relationship. The court identified both positive acts of misrepresentation ("[Rice] claims that the Diocesan Defendants' words and actions led her to believe she was safe with priests in general and with [Fr.] Bodziak in particular") as well as passive acts ("their refusal to enlighten her"). *Rice*, 212 A.3d at 1073–74 (internal citations omitted, second alteration in original). The panel acknowledged that silence in the absence of a duty to speak cannot qualify as fraudulent concealment. *Id.* at 1068 (citing *Lange v. Burd*, 800 A.2d 336 (Pa. Super. 2002)). It logically followed that silence in the presence of a duty to speak can qualify. In short, the required act of concealment is met if the relationship imposed a duty to speak.

Finally, portions of the Superior Court's opinion suggested that Rice could bring a cause of action for civil conspiracy as a separate tort subject to its own time limitation period without reference to the underlying torts committed by Bodziak. It is unclear if the

Superior Court opined that an action based on this tort could proceed even if the discovery rule and/or fraudulent concealment doctrines did not apply. On the one hand, the panel suggested that the civil conspiracy tort was separate. "If Ms. Rice proves all of this to a jury, she filed her lawsuit well within the two-year statute of limitations for civil conspiracy[.]" *Id.* at 1076. On the other, the Superior Court recognized that "it 'is well-settled that the statute of limitations for conspiracy is the same as that for the underlying action which forms the basis of the conspiracy.' " *Id.* at 1062 (quoting *Kingston Coal Co. v. Felton Min. Co., Inc.*, 690 A.2d 284, 287 (Pa. 1997)).

We granted the Diocese's petition for allowance of appeal on the following questions.

> (1) Did the Superior Court commit reversible error by misinterpreting the fact-specific holding of *Nicolaou v. Martin*, 649 Pa. 227, 195 A.3d 880 (2018) — a latent disease/medical malpractice case that did not purport to overrule *Meehan v. Archdiocese of Phila.*, 870 A.2d 912 (Pa. Super. 2005), *Baselice v. Franciscan Friars Assumption BVM Province, Inc.*, 879 A.2d 270 (Pa. Super. 2005), or any other precedent — thereby abrogating the statute of limitations and the discovery rule in civil actions?
>
> (2) Did the Superior Court commit reversible error by establishing for the first time a rule whereby a fiduciary once in a confidential relationship owes a never-ending duty to speak after the end of the relationship, thereby eliminating a plaintiff's duty to exercise due diligence and conduct a reasonable investigation in support of his/her causes of action?
>
> (3) Did the Superior Court commit reversible error by overruling precedent and holding that a plaintiff may bring a secondary cause of action for civil conspiracy where the primary cause of the harm is time barred?

*Rice v. Diocese of Altoona-Johnstown*, 226 A.3d 560 (Pa. 2020) (per curiam). When reviewing a trial court's order sustaining judgment on the pleadings, our standard of

review is to determine whether, based on the facts the plaintiffs pled, "the law makes recovery impossible." *Cagey v. Commonwealth*, 179 A.3d 458, 463 (Pa. 2018)). A judgment on the pleadings will be granted where, on the facts averred, the law says with certainty that no recovery is possible. *Emerich v. Phila. Ctr. for Human Dev., Inc.*, 720 A.2d 1032, 1034 (Pa. 1998). We regard as true all well-pleaded allegations in Rice's pleadings, as she is the non-moving party, and consider against her only those factual allegations in the Diocese's pleadings that Rice has admitted. *Grimes v. Enter. Leasing Co. of Phila., LLC*, 105 A.3d 1188, 1190 (Pa. 2014).

## II. Parties' Arguments

The Diocese argues that *Meehan* was correctly decided and based on its reasoning, Rice's knowledge of Bodziak's alleged assaults commenced the running of the statute of limitations. The discovery rule cannot apply because it governs situations in which the plaintiff is reasonably unaware of the injury. Because Rice knew of Bodziak's torts, she was required to investigate the Diocese as a possible additional cause of her injuries during the period of the statute of limitations as a matter of law. Diocese's Brief at 27-28. The Diocese criticizes the Superior Court's conclusion that *Nicolaou* overruled *Meehan* and its progeny sub silentio. *Id.* at 41.

Regarding fraudulent concealment, the Diocese argues that it did not mislead Rice. It again focuses on Bodziak's tortious conduct and explains that for fraudulent concealment to apply, the qualifying affirmative acts by the Diocese would be limited to factual misrepresentations regarding those injuries, e.g., assertions that the alleged sexual abuse did not occur or that the acts did not occur on church property. *Id.* at 61. Turning to the theory that silence qualifies as the relevant act of concealment, it stresses

that the key component of any fiduciary relationship is the superior position of one of the parties with respect to some fact known only to one side of the relationship. *Id.* at 65. Rice knew she was abused and did not need any further information from the Diocese to file suit against Bodziak. Additionally, the Diocese argues that the existence of any fiduciary-like relationship in this matter is irrelevant when considering application of fraudulent concealment in conjunction with the discovery rule, which still requires the plaintiff to act with reasonable diligence. In its view, the Superior Court's recognition of the "parishioner-plus" relationship completely relieves Rice of those obligations by creating a "never-ending, interminable duty to speak after the end of the relationship." *Id.* at 67. Cases applying fraudulent concealment have found that upon termination of the relationship the duty to speak ends. As a result, the Superior Court's novel "parishioner-plus" rule exists without limitation and undermines our discovery rule jurisprudence by relieving Rice of her discovery rule obligations.

In contrast, Rice maintains that the focus for the discovery rule is on the plaintiff's ignorance of the injury and asserts that a plaintiff must be aware of both the injury **and** its cause. While conceding that she could have filed suit against Bodziak, Rice maintains that she "was not on actual or constructive notice of Defendants' intentional acts and no amount of reasonable diligence could have discovered them, because the information regarding abusive priests was kept hidden in secret archives and unknowable to her or any outside agency" prior to the release of the grand jury report. Rice's Brief at 24. She argues that she had no obligation to investigate the Diocese's potential culpability absent a reason to suspect their involvement. Rice argues that whether or not she had an obligation to investigate presents a question of fact.

As to her ability to commence an investigation into the Diocese and its potential culpability based on her knowledge of the injury itself, Rice argues that the same logic applies to her case as in other cases where the discovery rule applies. For instance, a plaintiff suffering pain from a botched medical procedure can seek a second opinion and can learn the truth of what happened from that source. Rice argues that she was in a much worse position because she had no ability to discover the extent of the Diocese's alleged cover-ups. The information disclosed in the 2016 report was, in her view, "simply unknowable" until its publication. *Id.* at 32.

As to fraudulent concealment, Rice asserts that the Diocese both affirmatively misled her and had a duty to disclose its cover-up. For the former proposition, she disagrees that the concealment is limited to information regarding Bodziak's culpability; she states that her claims are focused on the Diocesan defendants themselves, who, inter alia, "falsely represented to her that each of the Diocese's priests … would act in her best interests and in the best interests of the children they served." *Id.* at 50. Those misrepresentations concern their torts and not Bodziak's torts. "Why … would she or should she be required under the doctrine to plead acts of concealment on the part of Defendants about matters she acknowledges she has always known and which have no bearing on the fraud claims she ultimately asserted against them?" *Id.* at 51. As to the duty to disclose, Rice urges the Court to recognize the "parishioner-plus" relationship, which, if established, would impose the requisite duty to speak.

Finally, while conceding that a plaintiff is still obligated to act diligently even in cases of fraud, Rice notes that our cases state that "there must be some demonstrable reason 'to awaken inquiry and direct diligence in the channel in which it would be

successful' in the first place." *Id.* at 45 (quoting *Wilson v. El-Daief*, 964 A.2d 354, 364 (Pa. 2009)). She argues that there was no reason to suspect the Diocese of wrongdoing.[1]

### III. Applicable Law

"Generally speaking, statutes of limitations are rules of law that set time limits for bringing legal claims." *Nicole B. v. Sch. Dist. of Phila.*, 237 A.3d 986, 993–94 (Pa. 2020). The time to file begins running "from the time the cause of action accrued[.]" 42 Pa.C.S.

---

[1] Five organizations have filed amicus curiae briefs in support of the Diocese: the Dioceses of Erie, Greensburg, and Scranton, as well as the Catholic League of Religious and Civil Rights and the Pennsylvania Catholic Conference. Generally, the various briefs offer arguments concerning the scope of the discovery rule and the fraudulent concealment doctrine. Some assert constitutional impediments to this Court's ability to modify the statute of limitations and to consider religious matters in establishing whether the "parishioner-plus" relationship has been established. Additionally, the Diocese of Greensburg argues that this case should be controlled by 42 Pa.C.S. § 5533(b)(2)(i), the current version of which permits an individual to file a civil action arising from sexual abuse thirty-seven years after reaching the age of majority. As the parties did not suggest that Section 5533(b)(2)(i) plays any role in this case, we decline to address it.

Rice has filed applications to strike portions of two of these briefs. First, a part of the Diocese of Scranton's brief provided a list of twenty-five cases pending in the courts of common pleas that take advantage of the *Rice* decision. Rice argues that these are not facts of record and additionally states that this Court cannot consider the implicit policy argument that affirming the Superior Court would result in increased financial burdens to these and other defendants. Second, Rice challenges the portion of the Pennsylvania Catholic Conference brief asserting that the vast degree of public information regarding sexual misconduct by Catholic priests triggered her diligence obligations as a matter of law. Rice states that this constitutes a legal argument not preserved by the Diocese. We deny both applications.

Four amici have filed briefs in support of Rice: the Survivors Network of Those Abused by Priests ("SNAP"), the Pennsylvania Association for Justice, Child USA, and the National Center for the Victims of Crime. The briefs argue that the Superior Court properly interpreted the discovery rule and fraudulent concealment doctrines. Some respond to the constitutional arguments raised, and SNAP offers an answer to the Diocese of Greensburg's analysis of Section 5533(b)(2)(i). Additionally, some of these briefs argue that the standard for diligence should be interpreted to encompass consideration of evidence that the harms inflicted on child sex abuse victims prevents these victims from filing suit in a timely fashion.

§ 5502(a). Normally, a cause of action accrues "when an injury is inflicted." *Wilson*, 964 A.2d at 361. Thus, the clock "begins to run as soon as the right to institute and maintain a suit arises; lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations[.]" *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983) (citations omitted). If the plaintiff fails to file before the clock expires, the statute of limitations bars the suit.

Various doctrines can save suits that would be otherwise untimely. Two are at issue here. The first, the discovery rule, "tolls the statute of limitations when an injury or its cause is not reasonably knowable." *In re Risperdal Litig.*, 223 A.3d 633, 640 (Pa. 2019). The purpose of this rule is clear: to "ensure that persons who are reasonably unaware of an injury that is not immediately ascertainable have essentially the same rights as those who suffer an immediately ascertainable injury." *Nicolaou*, 195 A.3d at 892 n.13. The plaintiff's inability to know of the injury must be "despite the exercise of reasonable diligence[.]" *Fine*, 870 A.2d at 858. This "is not an absolute standard, but is what is expected from a party who has been given reason to inform himself of the facts upon which his right to recovery is premised." *Id.*

In *Wilson*, we explained that two competing approaches have developed to the discovery rule. The more liberal approach, favorable to plaintiffs, "key[s] the commencement of the limitations period to such time as the plaintiff has actual or constructive knowledge of her cause of action." *Wilson,* 964 A.2d at 363 (citation omitted). In contrast, the stricter and less plaintiff favorable "inquiry notice" approach "t[ies] commencement of the limitations period to actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without

the necessity of notice of the full extent of the injury, the fact of actual negligence, or precise cause." *Id.* at 364. "Pennsylvania's formulation of the discovery rule reflects the narrower of the two overarching approaches[.]" *Id.*

The *Wilson* Court explained that adoption of the stricter approach effectuates legislative intent. "Although the discovery rule evolved out of the common law, it is now appropriately regarded as an application of statutory construction arising out of the interpretation of the concept of the 'accrual' of causes of action." *Id.* at 363 (footnote omitted). Thus, the rule "is best justified as an exercise in legislative interpretation rather than judicial innovation." *Id.* at 367. Accordingly, our ability to expand the discovery rule beyond the boundaries of the inquiry notice approach is circumscribed if not eliminated in the absence of a constitutional claim. "Absent a constitutional claim, we decline to question the legislative judgment." *Id.* at 369. We adhere to our statutory interpretations because "the legislative body is free to correct any errant interpretation of its intention." *Shambach v. Bickhart*, 845 A.2d 793, 807 (Pa. 2004) (Saylor, J., concurring).[2]

The fraudulent concealment doctrine is a distinct but related theory. Whereas the "discovery rule" tolls the statute of limitations, the fraudulent concealment doctrine "is based upon estoppel [and] has its basis in equity." *Johnson v. Wetzel*, 238 A.3d 1172, 1191 (Pa. 2020) (Wecht, J., concurring and dissenting). Generally speaking, tolling "pauses the running of, or 'tolls,' a statute of limitations when a litigant has pursued his rights diligently but some extraordinary circumstance prevents him from bringing a timely

---

[2]  Relatedly, "the Pennsylvania Constitution specifically recognizes the historical and central role of the General Assembly in establishing limitations periods by forbidding this Court from suspending or altering any statute of limitations or of repose via rulemaking." *Clark v. Stover*, 242 A.3d 1253, 1256 (Pa. 2020) (citing Pa. Const. art. V, § 10(c)).

action." *Dubose v. Quinlan*, 173 A.3d 634, 644 (Pa. 2017) (quoting *CTS Corp. v. Waldburger*, 573 U.S. 1, 9 (2014) (citation omitted)). When tolling is used as a proxy for "pause," the statute of limitations has conceptually started running but the applicable tolling principle serves to delay the point at which the plaintiff is charged with the duty to file suit. Fraudulent concealment, in contrast, is rooted in the recognition that fraud can prevent a plaintiff from even knowing that he or she has been defrauded. Effectively, the distinction is that where fraud has prevented the plaintiff from knowing of his or her cause of action, that cause of action simply does not even exist until the plaintiff becomes aware of, i.e., "discovers," the fraud.[3]

The relevant principles surrounding the fraudulent concealment doctrine were summarized by this Court in *Molineux v. Reed*, 532 A.2d 792 (Pa. 1987).

> Where, "through fraud or concealment, the defendant causes
> the plaintiff to relax his vigilance or deviate from his right of
> inquiry," the defendant is estopped from invoking the bar of

---

[3] Conceptually, we have recognized that "Equitable tolling has evolved as an 'umbrella' concept, encompassing a variety of rationales for tolling a statute of limitations." *Nicole B.*, 237 A.3d at 995 (citation omitted). And "fraudulent concealment," as well as the discovery rule, fall under that umbrella. *Id.* at 996 ("A broad array of situations have been deemed to fall within the concept of equitable tolling. These include fraud and concealment [and] tolling permitted under the discovery rule… ."). As a result, "fraudulent concealment" is occasionally used interchangeably with the "discovery rule" as the circumstances cited to justify the failure to file suit at an earlier time can implicate both doctrines. That is, the plaintiff's failure to "discover" the necessary knowledge can involve "fraud" as well as other considerations pertinent to a discovery rule analysis. *See Rotkiske v. Klemm*, 140 S. Ct. 355, 360 (2019) ("The phrase 'discovery rule,' however, has no generally accepted meaning. Rotkiske's arguments invoking the discovery rule implicate two distinct concepts—the application of a general discovery rule as a principle of statutory interpretation and the application of a fraud-specific discovery rule as an equitable doctrine."). Rice at times interchangeably cites "fraud" as a basis to both apply the discovery rule as well as claiming that her cause of action simply did not exist at all until discovery of the fraud. *See* Rice's Brief at 24 (characterizing the Diocese's position as "Rice [was] on notice that the Defendants had committed fraud"); *id.* at 38 (discussing discovery rule and arguing that Rice "did not know that the Defendants were a cause of her injuries until the 2016 Grand Jury Report").

the statute of limitations. *Schaffer v. Larzelere,* 410 Pa. 402, 405, 189 A.2d 267, 269 (1963). Moreover, defendant's conduct need not rise to fraud or concealment in the strictest sense, that is, with an intent to deceive; unintentional fraud or concealment is sufficient. *Walters v. Ditzler,* 424 Pa. 445, 227 A.2d 833 (1967); *Nesbitt v. Erie Coach Company,* 416 Pa. 89, 204 A.2d 473 (1964). Mere mistake, misunderstanding or lack of knowledge is insufficient however, *Schaffer v. Larzelere, supra*; and the burden of proving such fraud or concealment, by evidence which is clear, precise and convincing, is upon the asserting party. *Nesbitt v. Erie Coach Company, supra.*

*Id.* at 794.

As indicated, fraud or concealment incorporates a causal element by asking whether the fraud or concealment "cause[d] the plaintiff to relax his vigilance or deviate from his right of inquiry[.]" *Id.* That naturally raises the question as to whether a defendant who engaged in acts that amount to concealment for purposes of the doctrine can still raise a statute of limitations defense absent a plaintiff possessing actual knowledge of his or her cause of action. In *Fine*, this Court acknowledged the question: "Inasmuch as the doctrine is premised on a defendant's obstructionist conduct, there is an argument that a plaintiff's actual knowledge, of his injury and its cause, as opposed to the knowledge that reasonable diligence would give him, should control." *Fine*, 870 A.2d at 860–61. We rejected that view, concluding "that the standard of reasonable diligence, which is applied to the running of the statute of limitations when tolled under the discovery rule, also should apply when tolling takes place under the doctrine of fraudulent concealment." *Id.* at 861. Thus, even affirmatively misleading acts do not estop a defendant from invoking the statute of limitations if the party has failed to act with reasonable diligence.

Finally, the analysis employed can depart from these general principles if the legislature signals a contrary intention. For instance, in *Rotkiske*, the high Court noted

that "Congress has enacted statutes that expressly include the language Rotkiske asks us to read in, setting limitations periods to run from the date on which the violation occurs *or the date of discovery of such violation.*" 140 S. Ct. at 361 (citations omitted). Of note here, the Superior Court panel was persuaded by the fraudulent concealment analysis set forth in *Doe v. Presiding Bishop of The Church of Jesus Christ of Latter-Day Saints*, 2012 WL 3782454 (D. Idaho 2012). In that case, the applicable statute of limitation provided that where a suit is based on fraud or mistake the cause of action is "not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." Idaho Code Ann. § 5-218. The Pennsylvania statute of limitation at issue here, in contrast, does not reference discovery of the relevant facts.

## IV. Analysis

### A. Discovery Rule

We begin with this Court's discussion in *Wilson* describing the "inquiry notice" approach to the discovery rule as applied in Pennsylvania: it "t[ies] commencement of the limitations period to actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the inquiry, the fact of actual negligence, or precise cause." 964 A.2d at 364. The *Meehan* line of cases correctly applied the inquiry notice construct and concluded that "The child abuse is the injury in this matter, not the alleged cover-up by the [Diocese]. … [T]he plaintiffs' injuries, here, were known when the abuse occurred." *Meehan*, 870 A.2d at 920. Consequently, the statute of limitations began to run, at the

latest, when Rice was last assaulted by Bodziak. Rice had two years from that date[4] to discover other actors potentially liable for her injury.[5]

The *Wilson Court* noted that while discovery rule principles "are readily stated, numerous ambiguities arise out of their application." 964 A.2d at 362. Despite the fact that both the injury and a cause was immediately known to Rice, she attempts to create an ambiguity in the application of the discovery rule in her case by focusing on the absence of any reason to suspect the Diocese as a possible cause of her injuries. Rice maintains that the logic employed by the *Meehan* Court conflicts with other discovery rule cases like *Nicolaou* in which there was an issue of fact for the jury to decide. For instance, she argues that

> applying it to the facts of *Ni[c]olaou* would start the statutory period in 2009 at the latest, when the plaintiff was diagnosed with "probable Lyme disease," if not at the time of the tick bite

---

[4] The Diocese states that her claims expired in 1983. Diocese's Brief at 11 n.6. It notes that the minority tolling statute, which would extend the statute of limitations, was enacted in 1984 and thus takes the position that it would not apply. As Rice points out, the Diocese alleged in the trial court that the statute of limitations expired in 1987, when Rice turned twenty years old. Answer and New Matter, 10/4/2016 at 19, ¶ 98. We need not resolve the issue as it is clear the statute of limitations expired decades ago.

[5] Because we resolve this case based on Rice's obligations to inquire into the Diocese based on her knowledge of Bodziak's alleged torts that ended in 1981, we need not address the various arguments that, even if her diligence obligations did not commence at that time, the widely-publicized information about the Catholic Church's scandals required Rice to make inquiry well before 2016. The parties also devote considerable length to discussing the impact of the 2006 letter sent by the Diocese to Rice, inviting her to participate in an internal review process. Given the earlier expiration of the statute of limitations, these later events are irrelevant.

We also note that *Meehan*, likewise, involved later publication of Diocesan misconduct deemed to be irrelevant. The plaintiffs in that case "claim[ed] that they did not discover this pattern of conduct until 2002 when the Archdiocese of Philadelphia acknowledged allegations of sexual abuse against some of its priests, and the president of the United States Conference of Catholic Bishops published statements regarding the Catholic Church's response to the victims of clergy misconduct." *Meehan*, 870 A.2d at 918.

and resultant symptoms; and applying it to the facts of *In re Risperdal* would start the statutory period the minute the plaintiffs took the drug and began growing breasts.

Rice's Brief at 37. The flaw in the foregoing logic is that the plaintiff in *Nicolaou*, unlike Rice, lacked knowledge of an injury linked to the conduct of another.

*Nicolaou* involved a medical malpractice case for an injury arising out of the failure to diagnose and treat Lyme disease. Nicolaou was bitten by a tick sometime in 2001. Over the next eight to nine years, she sought treatment for symptoms of an unknown etiology from several providers, who ordered a total of four Lyme disease tests, all of which came back negative. An MRI reported findings "seen in infectious or inflammatory demyelinating process, such as [MS] or Lyme Disease[.]" *Nicolaou*, 195 A.3d at 883 (quoting record). Based on the MRI, a doctor informed Nicolaou that she suffered from multiple sclerosis ("MS"). Notwithstanding, Nicolaou continued to believe that she may have had Lyme disease. In July of 2009, she began seeing a nurse who relayed her opinion that Lyme disease, not MS, was the cause of Nicolaou's problems and prescribed antibiotics for Lyme disease to see how Nicolaou responded. She responded positively to the treatment. During one of these visits, the nurse offered the option of an advanced test for Lyme disease that cost approximately $250. Nicolaou initially declined but later decided to take the test, which came back positive for Lyme disease. Within two years of receiving the results, Nicolaou filed suit against various defendants for their misdiagnoses. The trial court granted summary judgment in favor of the defendants based on expiration of the statute of limitations.

The Superior Court affirmed, holding that as early as July of 2009 Nicolaou should have known as a matter of law that she suffered from Lyme disease. That conclusion

was based on the MRI test which had indicated that Nicolaou suffered from either MS or Lyme disease, the nurse's opinion, the availability of an advanced test that would provide a definitive answer and her postponed decision to take it. We reversed, holding that the Superior Court erred by isolating those facts indicating a diagnosis of Lyme disease from the entirety of her history of seeking a diagnosis and appropriate treatment. The Superior Court overlooked the constellation of contradictory facts; namely, everything that Nicolaou did, learned, and was told by medical professionals during the entire history of her efforts to treat her symptoms. *Nicolaou*, 195 A.3d at 894. We cautioned that "courts may not view facts in a vacuum when determining whether a plaintiff has exercised the requisite diligence as a matter of law[.]" *Id.*

*Nicolaou* did not announce any new principle of law. The plaintiff's cause of action accrued when she knew or should have known that Lyme disease was not treated as a result of repeated misdiagnosis by her health care providers. Given the lengthy history of attempted contradictory diagnosis and treatment, the date of accrual could not be determined as matter of law by the court and a jury would decide when she knew of an injury redressable by a lawsuit. The Superior Court's determination that *Nicolaou* overruled/modified decades of settled law on the accrual of causes of action and the running of the period of the statute of limitations was clearly erroneous.

It is obvious that there are no circumstances that are remotely comparable to *Nicolaou* in the case before us. The question in *Nicolaou* was when the plaintiff knew she was injured. Here, tragically, Rice knew of her injury at the time of each alleged assault and she knew that Bodziak caused the injury. "In Pennsylvania, a cause of action accrues when the plaintiff could have first maintained the action to a successful conclusion." *Fine*,

870 A.2d at 857 (citation omitted). An action against Bodziak could have been brought to a successful conclusion against Bodziak, at the latest, in 1983 or 1987.[6] She did not file suit against Bodziak and seek discovery from the Diocese. Her complaint does not allege that she made any formal or informal inquiries of the Diocese regarding, among other things, what it knew about Bodziak, its efforts to supervise or monitor him or its protocols, in general, for the placement of priests in parishes. Rice concedes that she did nothing until the grand jury report was published in 2016.

As *Meehan* correctly concluded, the real claim here is ignorance "of a secondary cause" of the known legal injury. *Meehan*, 870 A.2d at 920. Inquiry notice "t[ies] commencement of the limitations period to actual or constructive knowledge of at least some form of significant harm and of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the injury, the fact of actual negligence, or precise cause." *Wilson*, 964 A.2d at 364. Those conditions are met here where there was an actual known cause of a significant harm. The answer to the question of whether there may have been other causes that needed to be investigated during the period of the statute of limitations. Because her claims for damages against the Diocese are based on Bodziak's alleged conduct, she was on inquiry notice regarding other potentially liable actors, including the Diocese, as a matter of law.[7]

---

[6] *See supra* note 4.

[7] Rice also attempted to analogize her case to *In re Risperdal*, 223 A.3d 633 (Pa. 2019). This was a products liability case involving men who alleged they developed enlarged breasts (gynecomastia) from taking the antipsychotic drug Risperdal. As in *Nicolaou*, the statute of limitations issue revolved around when the plaintiffs knew or should have known of their injury to trigger the running of the statute of limitations. The defendants sought "a global ruling that all claims accrued for statute of limitations purposes no later than October 31, 2006, when [the manufacturer] changed the Risperdal label to reflect a

## B. Fraudulent Concealment

This Court held in *Fine* that the standard applied under the discovery rule requiring that a plaintiff exercise reasonable diligence to discover both an injury and its causes also applies when fraudulent concealment is the asserted basis for tolling the statute of limitations. 870 A.2d at 860–61. The fraudulent concealment theory manufactured by the Superior Court eliminates the plaintiff's due diligence obligations. *Fine* remarked that applying an identical due diligence standard to applications of both fraudulent concealment and the discovery rule "will serve one of the overarching tenets in this area of our jurisprudence—the responsibility of a party who seeks to assert a cause of action against another to be reasonably diligent in informing himself of the facts upon which his

---

greater association between gynecomastia and Risperdal." *Id.* at 635. The Superior Court agreed and held that summary judgment was properly entered. We reversed. We ultimately concluded that the Superior Court "fail[ed] to distinguish between knowledge of the **physical condition** of large breasts and the critical knowledge of an **injury**, gynecomastia." *Id.* at 642. We also noted that there was significant evidence of record to establish that the plaintiffs' weight gain was a reported risk of Risperdal and thus their physical conditions may have been attributable to that known side effect. The facts and circumstances precluded a determination as a matter of law that the statute of limitations accrued either at the time the label was changed or no later than June 30, 2009, a date that the trial court determined created a sufficient "environment" for publicization of the link between Risperdal and gynecomastia, thus creating a jury question. Like *Nicolaou*, we relied on *Wilson*, *Fine* and related precedents to reach our conclusion. *See also id.* at 653 (Baer, C.J., concurring) (noting that "Pennsylvania jurisprudence regarding the discovery rule … places a greater burden on plaintiffs as compared with the so-called 'liberal' approach applied by most of our sister states."). We find it inexplicable that the Superior Court never cited *Wilson*, never used the term "inquiry notice" nor discussed the distinction between Pennsylvania's and the more "liberal approach." The error running through the Superior Court's opinion is that it eschewed inquiry notice for the more generous accrual approach that was expressly described in *Wilson* as not the law of Pennsylvania. *Wilson*, 964 A.2d at 363–64. Respectfully, the same can be said of the dissenting opinion.

recovery may be based." *Id.* at 861.[8] Thus, our resolution of the application of the discovery rule to Rice's belated filing of her case against the Diocese defendants also resolves the application of the fraudulent concealment doctrine.

Rice alleges a variety of affirmative misrepresentations in support of her argument that the Diocese engaged in fraudulent concealment. She claims that the Diocese gave "false assurances in word and deed" that misled her into believing that "what had happened to her was an isolated event[.]" Rice's Brief at 52. She alleges a litany of facts that gave that impression, such as "hold[ing] Bodziak out as a cleric in good standing"; "us[ing] euphemisms to convey less serious reasons for removing offending clerics from Diocesan positions"; and "mak[ing] repeated and unequivocal public statements that they did not tolerate or ignore the sexual abuse of children and investigated all allegations of such behavior thoroughly and without delay." *Id.* Assuming the truth of these assertions and their tendency to deceive, none of these alleged misrepresentations misdirected Rice from her knowledge that Bodziak assaulted her, i.e., that she was injured and Bodziak caused the injuries. With that knowledge, her duty was to inquire into potential other causes of her injury, including the Diocese.

Rice additionally argues that the Diocese's silence constitutes a fraudulent concealment based on a fiduciary "parishioner-plus" relationship. The parishioner-plus fiduciary relationship is founded on the notion that certain members of a religious congregation are elevated to a position of special confidence and trust such that the

---

[8] While the application of the fraudulent concealment doctrine can implicate both a statutory interpretation issue as well as the fraud-specific equity theory as previously discussed, *see supra* note 3, the ability of a plaintiff to cite fraud as a basis to estop a statute of limitations defense is nonetheless linked to effectuating the time limits set by the General Assembly for filing an action.

religious organization is required to make full disclosures. *Id.* at 3 (asserting Diocese was required to "disclose their knowledge of the risks posed by child predator clerics and Bodziak in particular"). The alleged duty to disclose is a result of the additional involvement of the plaintiff in the workings of the congregation. However, an examination of the cases cited by the Superior Court that apply the "duty to disclose" theory demonstrates that the jurisdiction either (1) applies the more plaintiff-friendly approach to the discovery rule which addresses knowledge of a cause of action, or (2) applied a statutory expression by the legislative branch suggesting broader considerations than the fundamental principles we have outlined. *See, e.g., Doe v. Presiding Bishop of The Church of Jesus Christ of Latter-Day Saints*, 2012 WL 3782454 (D. Idaho 2012); *Wisniewski v. Diocese of Belleville*, 943 N.E.2d 43, 81 (Ill. App. Ct. 2011) ("The doctrine of fraudulent concealment is codified …'If a person liable to an action fraudulently conceals the cause of such action from the knowledge of the person entitled thereto… .' ") (citation omitted); *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 430 (2d Cir. 1999) (finding a fiduciary relationship and that the diocese owed a duty to investigate and to warn; statutory tolling provision applied where "any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action"). Here, under our inquiry notice approach and without a specific legislative command that modifies the general rules surrounding tolling, Rice not only had a reason but a duty to investigate the Diocese based on her knowledge of what Bodziak allegedly did. Thus, the Diocese's silence could not have dissuaded her from that investigation.

Under our jurisprudence, before a plaintiff may invoke the principles of fraudulent concealment, the plaintiff must use reasonable diligence to investigate her claims. The

statute of limitations on Rice's claims accrued when she knew she was injured by Bodziak. She had two years to investigate the Diocese's role, if any, in causing her injury. Assuming, arguendo, the imposition of a duty to speak, the failure to do so does not trump a plaintiff's due diligence obligation to investigate other possible causes of her known injury. Other jurisdictions confronting this issue have similarly concluded. *See*, *e.g.*, *One Star v. Sisters of St. Francis*, 752 N.W.2d 668, 682 (S.D. 2008) (plaintiffs were aware of abuse and identity of abusers; "[F]raudulent concealment does not apply, even where a confidential relationship exists, if the plaintiff obtains knowledge of the basic operative facts.") (quotation marks and citation omitted); *Mars v. Diocese of Rochester*, 763 N.Y.S.2d 885, 889 (N.Y. Sup. Ct. 2003) (even if fiduciary relationship could be established "No alleged conduct on the part of the Diocese prevented plaintiffs from gathering essential facts prior to the expiration of the statute."); *Doe v. Roman Catholic Diocese of Charlotte, NC*, 775 S.E.2d 918, 922 (N.C. Ct. App. 2015) ("But under North Carolina law, even when there is a special relationship between the plaintiff and the defendant, the duty of inquiry" applies ) (citation omitted).

Implicit in Rice's argument is that given the depth of the fraudulent concealment of Bodziak's and other priests' deviant conduct, no amount of due diligence by Rice would have unearthed the Diocese's role. In other words, investigation by her would have been futile. We note that the Supreme Court of Utah's decision in *Colosimo v. Roman Catholic Bishop of Salt Lake City,* 156 P.3d 806 (Utah 2007), addressed this precise argument. Like Pennsylvania, Utah follows the inquiry notice approach. *See Macris v. Sculptured Software, Inc.*, 24 P.3d 984, 990 (Utah 2001) ("Once inquiry notice triggers the accrual of the statute of limitations, a claimant may not then toll the running of the statute under the

principle of exceptional circumstances."). *Colosimo* did not explicitly address a purported "duty to speak" created by an asserted confidential relationship even though that argument by the plaintiff appeared to be implicit. *See Colosimo*, 156 P.3d at 809 (noting that the plaintiffs asserted claims for, inter alia, "breach of fiduciary duty"). More directly than Rice, the plaintiffs in *Colosimo* argued that "their failure to inquire about possible causes of action against the institutional defendants should be excused because any such inquiry would have been futile." The court responded:

> [D]etermining when a plaintiff knew or should have known of a cause of action requires evaluating "the reasonableness of a plaintiff's conduct in light of the defendant's fraudulent or misleading conduct." **This suggests that before a plaintiff may rely on the fraudulent concealment doctrine, he must have actually made an attempt to investigate his claim** and that such an attempt must have been rendered futile as a result of the defendant's fraudulent or misleading conduct.

*Id.* at 816–17 (citation and footnotes omitted, emphasis added).

This analysis comports with application of a fraudulent concealment theory based on a heightened fiduciary duty in the context of the inquiry notice component of the statute of limitations. Determining whether the alleged failure to speak explains a plaintiff's failure to conduct investigation requires an examination of how the purported undisclosed information dissuaded her from pursuing her inquiry into other potential causes of the injury attributable to Bodziak. Here, Rice did not exercise any due diligence. There was no attempt to investigate through interrogatories, deposition, request for production of documents or otherwise. Even if the Diocese was obligated to disclose,[9] the failure to do

---

[9] The duty to disclose envisioned by Rice presupposes knowledge of Bodziak's deviant conduct which more directly supports a claim that he should not have been placed in the parish in the first instance. Any attempt to investigate the Diocese's knowledge concerning Bodziak would have fulfilled her due diligence obligation. The duty to speak

so does not excuse her own failure to conduct any investigation into the Diocese as an additional cause of her injuries.[10]

This conclusion is mandated by the objectives of the General Assembly as discerned by this Court. Statutes of limitations exist "to expedite litigation and thus discourage delay and the presentation of stale claims which may greatly prejudice the defense of such claims." *Gustine Uniontown Assocs., Ltd. v. Anthony Crane Rental, Inc., L.P.*, 842 A.2d 334, 346 (Pa. 2004) (citation omitted). Delay is discouraged, first and foremost, through the imposition of diligence obligations that require the plaintiff to conduct investigations of potential lawsuits. Accepting Rice's argument that the Diocese had a duty to inform Rice of the facts regarding the alleged cover-up as a predicate to the accrual of a cause of action against it would eliminate the due diligence obligations imposed by the discovery rule. Pausing the running of the statute of limitations "arises from the inability, despite the exercise of diligence, to determine the injury or its cause, not upon a retrospective view of whether the facts were *actually* ascertained within the period." *Pocono Int'l Raceway*, 468 A.2d at 471–72. Contrary to Rice's position, her inability to determine the Diocese's role cannot be presupposed.

---

in this context is an obscure path to establishing that the Diocese was negligent (or worse) in exposing Rice to Bodziak by placing him in the parish — a less circuitous path to the same result.

[10] Rice would of course have a fraudulent concealment defense had she inquired during the limitations period and the Diocese misled her. *See Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436 (Tenn. 2012) (agreeing that plaintiff was on inquiry notice against diocese based on abuse itself but remanding for fraudulent concealment factfinding due to allegation "that at some point, Mr. Redwing or his family asked the Diocese about its knowledge of Fr. Guthrie's conduct and that the Diocese's response misled them."). Because Rice did not make such inquiries, her diligence obligations predicated on the inquiry notice approach forecloses application of the fraudulent concealment doctrine.

Rice's reliance on the parishioner-plus theory requires rejection of the inquiry notice approach to determine when a cause of action accrues. At its core, the theory advanced by Rice requires an application of the accrual method, expressly rejected in *Wilson*, that her injury does not accrue until she had actual or constructive knowledge of her cause of action against the Diocese. Instead, her injury accrued despite her lack of knowledge of causes additional to Bodziak. We acknowledged in *Wilson*, and do so now, again, that the inquiry notice approach is strict and can be perceived as harsh. It is, however, reflective of our discernment of legislative intent. Providing relief from the consequences of the harshness is not in the purview of this Court.

## C. Civil Conspiracy

Finally, we address the Diocese's third argument. It challenges the Superior Court's suggestion that civil conspiracy is a standalone tort subject to its own statutory computation period without reference to the timeliness of some other underlying tort. The Diocese claims that the Superior Court arguably announced a new tolling doctrine. Rice agrees that a predicate tort is needed and identifies that tort as fraud. Rice's Brief at 62. Additionally, Rice agrees that the statute of limitations has expired on her fraud claims, although she "takes no position as to when her fraud claims accrued and by what date she was required to assert them." *Id.* at 8 n.2. In any event, Rice agrees that "the outcome in her case depends on application of the discovery rule and the doctrine of fraudulent concealment." *Id.* As we conclude that neither the discovery rule nor fraudulent concealment apply, the issue has not been squarely presented and we disapprove of the Superior Court's decision to the extent it could be read to announce a standalone tolling doctrine for civil conspiracy cases.

## V. Conclusion

We conclude, as the Superior Court properly did fifteen years ago under the same circumstances, that the inquiry notice approach to the discovery rule required Rice to investigate the Diocese as a potential additional cause of her injuries during the limitations period. Whether courthouse doors should be opened for suits based on underlying conduct that occurred long ago is an exercise in line drawing that includes difficult policy determinations. "Although any statute of limitations is necessarily arbitrary, the length of the period allowed for instituting suit inevitably reflects a value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones." *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 463–64 (1975). The judiciary is ill-equipped to make that call. *See, e.g.*, *Lance v. Wyeth*, 85 A.3d 434, 454 n.26 (Pa. 2014) (recognizing the General Assembly's superior ability to examine social policy issues and determine appropriate balancing of competing concerns). Indeed, we are constitutionally barred from doing so. *Clark*, 242 A.3d at 1256. Even in view of the reprehensible circumstances depicted in this case, and others like it, we must follow the rule of law and enforce the value judgments expressed by the General Assembly. We therefore reverse the order of the Superior Court and reinstate the trial court's dismissal of the case.

Chief Justice Baer and Justices Saylor, Dougherty and Mundy join the opinion.

Chief Justice Baer files a concurring opinion.

Justice Wecht files a dissenting opinion in which Justice Todd joins.